**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL R. AUTERY, husband and
the marital community composed
thereof; RITA ANN AUTERY, wife
and the marital community
composed thereof; SUSAN AUTERY,
A SINGLE WOMAN; JOSEPH
BALMELLI, husband and the marital
community composed thereof;
DONNA BALMELLI, wife and the
marital community composed
thereof; VICTOR BELOUSOV,
husband and the marital
community composed thereof;
GALINA BELOUSOV, wife and the
marital community composed
thereof; DANIEL BELOUSOV, their
minor children; DENNIE BELOUSOV,
their minor children; BENTON
COUNTY, a political subdivision of
Washington State; BENTON COUNTY
PUD, a municipal corporation;
THOMAS M. BRUN, husband and the
marital community composed
thereof; KAREN M. BRUN, wife and
the marital community composed
thereof; CHARLOTTE BURRUS, a
single woman; KELVIN CHURCH,
husband and the marital
community composed thereof;

No. 04-35105
D.C. No.
CV 02-05113-EFS

OPINION

12991

TERESA BEVAN-CHURCH, wife and
the marital community composed
thereof, as Personal Representative
for the Estate of Abigail Kimberly
Grace Bevan-Church; ALEXANDREW
BEVAN-CHURCH, their minor
children; ALEXANDREA BEVAN-
CHURCH, their minor children;
SAMUEL BEVAN-CHURCH, their
minor children; GEORGE BEVAN-
CHURCH, their minor children;
SUSAN BEVAN-CHURCH, their minor
children; KIMBERLY BEVAN-
CHURCH, their minor children;
ABIGAIL KIMBERLY GRACE BEVAN-
CHURCH, the Estate of, their minor
child; THAD COLEMAN, a single
man; CARL W. CRAWFORD, husband
and the marital community
composed thereof; MYRTLE F.
CRAWFORD, wife and the marital
community composed thereof;
ELOISE M. DEVINE, a single
woman; SARAH DURBIN, a single
woman; KENNETH ELLIOTT, husband
and the marital community
composed thereof; CATHERINE
ELLIOTT, wife and the marital
community composed thereof;
CHARLES EVANS, husband and the
marital community composed
thereof; MAXINE EVANS,

wife and the marital community composed thereof; CASSANDRA EVANS, a single woman; JARED EVANS, a single man; JOHN EVANS, a single man; RANDLE FELTS, a single man; PHILLIP HARPER, husband and the marital community composed thereof; FLOY HARPER, wife and the marital community composed thereof; RICHARD HOWARD, husband and the marital community composed thereof; VIRGINIA HOWARD, wife and the marital community composed thereof; SHANNON HOWARD, a single woman; MARK HUNTSMAN, husband and the marital community composed thereof; MICHELE HUNTSMAN, wife and the marital community composed thereof; MICHAEL HUNTSMAN, their minor child; CARRIE HUNTSMAN, a single woman; WILLIAM ISLEY, husband and the marital community composed thereof; CONNIE ISLEY, wife and the marital community composed thereof; JOEY ISLEY, their minor son; MARLA SHAFFER,

a single woman; DONALD W. KRUGER, husband and the marital community composed thereof; LENORE L. KRUGER, wife and the marital community composed thereof; TIMOTHY LACY, husband and the marital community composed thereof; MARTHA LACY, wife and the marital community composed thereof; JOSHUA LACY, their minor children; LAURA LACY, their minor children; JOHN D. LEONARD, husband and the marital community composed thereof; JUDY LEONARD, wife and the marital community composed thereof; KEVIN LEONARD, a single man; OLE LEONARD, husband and the marital community composed thereof; PAT LEONARD, wife and the marital community composed thereof; ERIC A. MCELROY, husband and marital community composed thereof; NANCY MCELROY, wife and the marital community composed thereof; CHRISTOPHER MCELROY, their minor children; ERIN MCELROY, their minor children; BRENDAN MCELROY, a single man;

EDWARD NEASHAM, a single man;
IRENE NEASHAM, a married woman
aka Irene Peck; IRENE PECK, a
married woman; EARL NORMAN,
husband and the marital
community composed thereof;
GAYLYNN NORMAN, wife and the
marital community composed
thereof; CORINNA NORMAN, their
minor children; KRISTA NORMAN,
their minor children; JILLLYN
NORMAN, their minor children;
HANNAH NORMAN, their minor
children; CODY NORMAN, their
minor children; KRISTIN PECK, a
single woman; MARTY ALLEN
PECK, a single man; BRAD ROACH,
husband and the marital
community composed thereof;
CARLA ROACH, wife and the
marital community composed
thereof; ALYX BURNHAM, husband
and the marital community
composed thereof; RACHEL
BURNHAM-ROACH, wife and the
marital community composed
thereof; JERRY ROSE, husband and
the marital community composed
thereof; PATRICIA ROSE, wife and
the marital community composed
thereof; JACK ROSE, a single man;
NICHOLE ROSE, a single woman;
RICHARD ROSE, a single man;

WILLIAM A. SMITH, a single man;
DUSTIN SMITH, his minor children;
JEREMY SMITH, his minor children;
CHARLES SMITH, his minor
children; VICTORIA SMITH, his
minor children; MICHAEL P. STORM,
husband and the marital
community composed thereof;
KATHRYN STORM, wife and the
marital community composed
thereof; MATTHEW STORM, their
minor child; SEAN STORM, a single
man; RAYMOND WEAVER, JR.,
husband and the marital
community composed thereof;
DONZEL WEAVER, wife and the
marital community composed
thereof; JOHN M. ZACHARA, a
single man; PETER D. ZACHARA, his
minor child; AMY O. ZACHARA, a
single woman; HEATHER R.
ZACHARA, a single woman; DILLON
M. ZACHARA, a single man; STATE
FARM INSURANCE COMPANY, as
subrogee for its insureds; ELMER
AINSWORTH; MILDRED AINSWORTH;
W.W. BRADHAM; DOLORES P.
BRADHAM; LINDA R. CLEMENSEN;
WILLIAM T. ROBERTS; MUTUAL OF
ENUMCLAW INSURANCE COMPANY, as
subrogee for its insureds; JOHN G.
COOKE; P. ANTOINETTE COOKE;
FOREMOST INSURANCE COMPANY, as
subrogee for its insured; D. DAVIS;

RICKY HUCKFLDT; CATHY L.
HUCKFELDT; PEMCO INSURANCE
COMPANY, as subrogee for its
insureds; WALTER LAIS; BEVERLY
LAIS; JOHN NOVAK; MARGARET
NOVAK; CLIFFORD PENDELL; MARIE
PENDELL; JIMMIE ROSS; ROXIE ROSS;
TERESA SMITH; ERNEST FLOYD;
RICHARD E. WELCH; NEIL D.
ZIMMERMAN; JANE THOMAS; SANDA
PIERCE, individually and as
Personal Representative of the
Estate of Robert Pierce; the estate
of ROBERT PIERCE; ROBERT RANCH,
a Washington partnership; BRAD
HOWARD, a single man; KEVIN
LONG, a single man; LLOYDS OF
LONDON, Interested Underwriters
at, as subrogee for its insured;
METROPOLITAN MORTGAGE, and all
other persons similarly situated as
a pendent class suffering damage
and/or injuries; STATE OF
WASHINGTON, by and through
Daniel R. Autrey,
ET UX., ET AL., as private attorney
generals, and all other persons
similarly situated as a pendent
class suffering damage and/or
insuries; DEMINA KLAVDIYA;
LYUDMILA BELOUSOVA,
                    *Plaintiffs-Appellants,*
                v.

UNITED STATES OF AMERICA;
DEPARTMENT OF ENERGY;
DEPARTMENT OF THE INTERIOR;
STATE OF WASHINGTON, by and
through Daniel R. Autrey, ET UX.,
ET AL., as private attorney generals,
and all other persons similarly
situated as a pendent class
suffering damages and/or injuries,
                  *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
February 18, 2005—Seattle, Washington

Filed September 12, 2005

Before: Betty Binns Fletcher, Ronald M. Gould,
Circuit Judges, and Samuel P. King, District Judge.*

Opinion by Judge King

---

*Honorable Samuel P. King, Senior United States District Judge for the
District of Hawaii, sitting by designation.

**COUNSEL**

Robert A. Dunn, Spokane, Washington; Thomas A. Wolfe, Seattle, Washington; and William J. Flynn, Jr., Kennewick, Washington, for the plaintiffs-appellants.

Rolf H. Tangvald, Assistant United States Attorney, Spokane, Washington, for the defendants-appellees.

---

**OPINION**

KING, District Judge:

Numerous individual and corporate victims of a large wildfire in southeastern Washington State appeal the district court's dismissal for lack of subject matter jurisdiction of their suit brought under the Federal Tort Claims Act (FTCA) 28 U.S.C. §§ 1346(b), 2671-80. The suit sought substantial damages, alleging, among other things, negligence against the United States in not maintaining firebreaks. The district court dismissed based upon the FTCA's independent-contractor and discretionary-function exceptions.

We agree with the district court that relevant decisions regarding fire prevention were encompassed in the government's contracts with Fluor Daniel Hanford, Inc., a.k.a. Fluor Hanford, Inc., (Fluor) and Fluor's corresponding subcontract with DynCorp Tri-Cities Services, Inc. (DynCorp). The action is therefore barred by the independent-contractor exception to the FTCA. *See* 28 U.S.C. § 2671 ("As used [in the FTCA] the term 'Federal agency' . . . does not include any contractor with the United States"). Because we affirm on that ground, we do not reach whether the suit is also barred by the discretionary-function exception in 28 U.S.C. § 2680(a).

## I. FACTUAL BACKGROUND

The suit arises from the 24 Command Wildland Fire (a.k.a. the 24 Command Fire), which burned from June 27 to July 1, 2000. The wildfire was triggered by an automobile crash on Washington State Route 24 (SR-24). SR-24 is located on an easement over federal property granted by the United States

to the State of Washington. The wildfire eventually charred some 164,000 acres of public and private lands on and near the United States Department of Energy's (DOE's) Hanford Site. The Hanford Site encompasses over 560 square miles of government property in the southeastern part of Washington in Benton County near Richland.

The Hanford Site includes within it the 120-square-mile Fitzner-Eberhardt Arid Lands Ecology Reserve (ALE Reserve or ALE). The ALE Reserve is an ecologically sensitive area with significant natural and cultural resources. The DOE transferred, or began transferring, management of the ALE to the United States Fish and Wildlife Service (FWS) in June of 1997. The terms of the transfer are set forth in a June 20, 1997, Permit and Memorandum of Understanding (MOU) between the DOE and FWS.

Specific control of the ALE is important here because the fire started on the ALE — or, more particularly, on SR-24 — and quickly spread to the ALE. Plaintiffs' primary FTCA claim is that the United States (either the DOE or the FWS) negligently maintained firebreaks near SR-24 along the ALE and such negligence caused fire to spread from SR-24 onto the ALE and ultimately to Plaintiffs' properties.[1]

The DOE had a large (over $2.8 billion, as of August 27, 1999) contract with Fluor for "planning, managing, integrating, operating and implementing" a wide range of activities at the Hanford Site. In turn, Fluor subcontracted with DynCorp, to provide certain services, including "Emergency Services."

---

[1]Plaintiffs have abandoned claims regarding negligence in the actual fire fighting or fire suppression efforts. The district court held such claims barred by the independent-contractor and discretionary-function exemptions, and no argument was made on appeal that the decision as to fire suppression or fire fighting was erroneous. *See Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1548 (9th Cir. 1988) (stating that issues not raised in opening brief are waived). This appeal focuses on fire prevention responsibilities.

The subcontract was effective October 1, 1996, and was modified effective March 27, 2000 (although there apparently has been a similar contractual relationship from at least 1984). The subcontract defines "Emergency Services" as:

    1.   Fire Protection Engineering.

    2.   Fire Department Emergency Response, including:

        a.   Fire Suppression.

        b.   Rescue.

        c.   Emergency Medical/Ambulance.

        d.   Hazardous Material Spill Response.

        e.   Incident Command.

    3.   Fire Protection System Inspection and Maintenance.

    4.   Fire Prevention.

The Hanford Fire Department (HFD) was a subsidiary of DynCorp during the relevant period.[2] Thus, HFD is a private entity and is the subcontractor retained to provide "Emergency Services." HFD's fire chief at relevant times was Don Good.

The government argued that the plain terms of these contracts established that the DOE contracted with Fluor, which subcontracted with the HFD, to provide fire prevention and fire protection on the Hanford Site, including the ALE. Accordingly, the government contended (and the district court

---

[2]HFD later became part of Fluor itself.

agreed) that the independent-contractor exception to the FTCA immunizes the United States from the alleged negligence that could have contributed to the 24 Command Fire.

### A.  *The Contractual and Management Details*

The Fluor contract with the DOE provided in pertinent part:

> [Fluor] shall provide technical and administrative emergency management services to Hanford Emergency Preparedness. The work scope includes maintaining the Hanford Emergency Management Plan and Implementing Procedures, managing the Hanford Site Emergency Exercise Program, maintaining the site emergency response organization and facilities, training site emergency response organization members. . . .

> [Fluor] shall provide an emergency response capability for facilities under its control that implements the Hanford Emergency Management Plan . . . as modified from time to time.

In turn, the subcontract between Fluor and HFD provided that HFD would be responsible for "Emergency Services." As quoted earlier, "Emergency Services" include "Fire Protection Engineering" and "Fire Prevention." That is, unless the contract was somehow modified later, HFD was required by contract to provide fire protection and prevention to all of the Hanford Site.

Hence, we look to the terms and circumstances of the MOU by which DOE transferred (or began transferring) management of the ALE to FWS in June of 1997. The MOU did not transfer actual title of the ALE to FWS; the ALE was still part of Hanford and was still owned by DOE. The MOU dealt with management responsibility. Section 4.3 of the MOU provided:

FWS will be responsible for coordination of the law enforcement, fire protection, emergency preparedness, and emergency medical services programs and general maintenance and administration for the ALE. FWS will coordinate with the appropriate DOE-RL POC [Department of Energy Richland Point of Contact, who was Craig Christenson] as identified in Attachment 4 of the Permit, for fire protection and emergency preparedness issues and maintenance and administrative issues of the ALE.

Section 5.5 provided:

*Until FWS has developed its own approved management plan and has upgraded its own fire protection capabilities for the ALE*, the appropriate DOE[-]RL POC as identified in Attachment 4 of the Permit, *is responsible for providing FWS fire protection*, including initial attack and incident management, for ALE structures and wildlands, on a cost reimbursable basis from FWS. (Emphasis added).

There was no such "approved management plan" when the wildfire occurred in June 2000, meaning that at that time — at least as between DOE and FWS — DOE was still "responsible for providing FWS fire protection, including initial attack and incident management, for ALE structures and wildlands, on a cost reimbursable basis from FWS." The government contends that such responsibilities were ongoing as part of the Fluor contract, and related subcontract with HFD.

The MOU required FWS "to manage the ALE consistent with the existing Arid Lands Ecology (ALE) Facility Management Plan . . . dated February 1993, prepared by Pacific Northwest National Laboratory [a contractor a.k.a. Battelle Memorial Institute] and approved by DOE-RL." In turn, section 4.2.7 of the 1993 ALE Facility Management Plan contained the following language regarding "Fire Management":

**Policy:** Minimize the potential for human-caused fires on the ALE by maintaining fire breaks along site boundaries to limit the passage of fires onto or off ALE, and if fires should occur, fighting fires along existing fire breaks, roadways, and near buildings.

**Implementation:** All fire fighting is the responsibility of the Hanford Site Fire Department. The ALE facility manager will periodically review the fire prevention and fire fighting plans with the Hanford Site fire protection personnel, ensuring that facility users take appropriate steps to minimize the possibility of causing a fire and advising facility users of actions that they should take if they encounter a fire while in the field. Procedures for establishing firebreaks and protecting them from wind erosion need to be established.

The 1993 ALE Facility Management Plan contains a disclaimer indicating "the views and opinions of [Battelle] expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof," although the plan was "approved" by the DOE. The document also indicates that "[t]he DOE retains final authority over all decisions, policies, and operations regarding ALE Site management." It states that "[t]he ALE facility manager will use this plan to guide decisions on managing the [ALE]."

After the June 20, 1997, MOU was signed, the DOE notified Fluor of the management transfer and indicated that Fluor was "to continue to provide fire protection services . . . to ALE." A letter dated July 17, 1997, from the DOE to Fluor stated:

The MOU requires *fire protection services* to continue to be provided to ALE until FWS has developed its own approved management plan, and

upgraded its own fire protection capabilities for the ALE.

Effective immediately you [Fluor] are directed to continue to provide *fire protection services* from the Hanford Fire Department (HFD) to ALE on a cost reimbursable basis to FWS, and coordinate planning activities directly with the FWS[.] (Emphasis added).

On October 6, 1997, Fluor in turn officially notified Dyn-Corp (and HFD) of the DOE's July 17, 1997, letter. Fluor's letter to DynCorp provided:

The referenced letter [of July 17, 1997] (attached) provides direction for the Hanford Fire Department to continue to provide *fire protection services* to the Arid Lands Ecology Reserve on a cost reimbursable basis to the U.S. Fish and Wildlife Service. You are requested to proceed with implementation of this request and to notify this office when the arrangements are completed. (Emphasis added).

Also, in September of 1998, FWS entered into a direct agreement with HFD regarding fire protection of the ALE. A September 14, 1998, "Cooperative Agreement" provided:

1. *Purpose*

The Cooperative Agreement is entered into between [FWS] and [HFD] to providing [sic] fire protection and wildfire suppression for the [FWS] managed lands located within the Hanford Site boundaries in Benton County, Washington [i.e., the ALE].

. . . .

3. *Scope*

A. The HFD agrees to:

1. Provide first response fire fighting personnel and equipment (units) as available for fires within the boundaries of [the ALE];

2. Provide ongoing fire fighting, medical, and overhead team services as available, and at the request of [FWS];

. . . .

4. Notify [FWS] as immediately when a fire occurs and HFD responds to a fire on ALE. . . .

5. Avoid the use of tractors, graders and all other ground surface breaking/modifying equipment without prior approval of [FWS], except when the use of such equipment is essential to protect life, private property, or prevent the spread of fire to the Hanford Site east of Highway 240.

As discussed later, the particular language of the "Purpose" and "Scope" sections is important in analyzing whether the Cooperative Agreement might have changed any of the contractual responsibilities.

In regards to HFD's duties, HFD Fire Chief Don Good stated in a declaration that "the HFD has the authority, responsibility and discretion to implement HFD's fire fighting and fire prevention management activities on the ALE." In his deposition he testified in pertinent part as follows:

Q. [Plaintiffs' counsel]: . . . you're referring to page 4.7, section 4.2.7 [of the 1993 ALE Facility Management Report]? . . . . And under 4.2.7, can you tell me where in 4.2.7 it says that HFD has the authority, responsibility, and discretion to implement firefighting and fire prevention management activities?

A. [Good]: Okay. It's on page 4.7, second paragraph under Implementation: All firefighting is the responsibility of the Hanford Site Fire Department.

. . . .

Q. Well, that talks about firefighting though. Your statement goes on to talk about *fire prevention management activities*. Where in 4.2.7 does it say that? [Emphasis in original.]

A. It doesn't say that in that statement, but that's all inclusive. Firefighting, fire prevention, fire protection is all inclusive and one's part of the other one. It's all inclusive.

. . . .

Q. . . . . As a term of art in your profession is fire prevention different than the term firefighting?

A. Yes.

Q. Okay. And is the term in your profession fire prevention different than the term fire protection?

A. Yes.

Later, Good was asked about the scope of HFD's agreement for fire services:

Q.   Do you know whether DynCorp [HFD] has an agreement with FWS or DOE for reimbursement for fire services rendered?

. . . .

A.   Yes.

Q.   Okay. And what's your understanding?

A.   There's a Cooperative Agreement that says if we provide firefighting for U.S. Fish and Wildlife, they have to reimburse costs.

. . . .

Q.   For firefighting?

A.   Correct.

Q.   How about fire prevention?

A.   We don't do any fire prevention for U.S. Fish and Wildlife.

Q.   Okay. And how about fire protection?

A.   We don't do any fire protection for U.S. Fish and Wildlife.

. . . .

Q.   . . . Does the HFD have an agreement with DOE for firefighting services?

A.   Through our contract we have an agreement. There is no agreement with HFD and DOE. We have an agreement with the contractor that we work for

who has an agreement and contract with Department of Energy.

. . . .

Q.   . . . So in 2000, as best you understand it, there was no contract between DOE and DynCorp for providing fire prevention services?

A.   That's correct.

Q.   Or fire protection services?

A.   That's correct.

Q.   Okay. And in 2000, if I understand you correctly, HFD did no fire prevention for Fish and Wildlife Service?

A.   That is correct.

Q.   And did no fire protection for Fish and Wildlife Service?

A.   That is correct.

Q.   Okay. So the reimbursement that HFD would be receiving would be for firefighting?

A.   And managing the fire, yes.

B.   *Maintenance of Firebreaks on the ALE near SR-24*

Hanford and the ALE had a history of wildfires. In particular, a large (200,000 acre) fire, the Hanford Range Fire, occurred in 1984. That wildfire led to much discussion and direction regarding establishing and maintaining firebreaks along roadways at the Hanford Site. Since 1985, and prior to

the 24 Command Fire, maintenance of firebreaks along ALE roadways (and SR-24 in particular) was complicated by a number of factors.

SR-24 itself is a Washington State roadway. The DOE granted Washington an easement in 1985 for the road. The easement provided that "The [State of Washington] shall maintain the property in good condition and make necessary repairs."

Over the years, firebreak maintenance near SR-24 on ALE borders was done in several ways: (1) "discing," which involved "turning over the earth using machinery to break up vegetation"; (2) spraying herbicide; (3) mowing vegetation; and (4) performing controlled burns of vegetation and vagrant tumbleweeds. Discing, however, creates dust.[3] In 1994, Washington State or Benton County clean air authorities notified HFD and the DOE that, as a matter of state law, landowners must take reasonable precautions to prevent "fugitive dust." Thus, in 1995 discing on the ALE stopped. Rather, according to a 1995 letter from HFD Fire Chief Don Good to the DOE, firebreaks were created between the roads and ALE property by applying herbicide on the easement:

> A plan was developed wherein site services cooperatively clear the right-of-way between the highway fence and the road shoulder, after which the state will keep this additional space mowed. The existing firebreaks, which are now crusted over, will be left to develop ground cover. A fire break will then be created between the road and the fence which matches or exceeds the distance of the old fire break. The state will continue to spray herbicides about six to eight feet on each side of the hard surface roadbed and the short grass will keep the dust under control.

---

[3]Bulldozing also was discussed before 1984, but it also apparently creates its own set of environmental problems.

Washington State or Benton County also regulates burning of tumbleweeds, and thus the last "controlled burn" before the 24 Command Wildfire occurred in 1995. And so, the record indicates that after 1995 — and before the 1997 MOU transferring management from the DOE to FWS — neither the DOE nor FWS nor HFD actually "maintained" firebreaks (at least by discing or by controlled burns) on the ALE near SR-24. Such maintenance was done, if at all, by the State on its easement. Maintenance, apparently by the State, consisted of spraying herbicides, perhaps some controlled burning (until 2000), and mowing vegetation.

These limitations, whether real or self-imposed, on firebreak maintenance near state roads were apparently a source of frustration for some in the DOE and HFD. Indeed, in an internal email of May 2000 — only a month before the 24 Command Wildfire — Craig Christenson, the DOE's fire prevention engineer for Hanford, wrote the following prescient comment when asked about a controlled burning policy at Hanford:

> . . . We have not done any control burns in the past few years due to environmentalist concerns and enforcement actions given down by our Local [County] (Benton County) Clean Air Authority. We can't even cut fire breaks anymore! All we can do is use [sprayed] on herbicide to kill off weeds in their early growth and that has a very limited effect. Since we have not been able to manage (do effective burns) the wildland fuel growth along natural and man-made fire breaks (like roadways), I predict we will ultimately have a very large wildland fire in the near term future similar in size to the 1984 Hanford Range Fire.

The record also indicates that a moratorium was placed in June of 2000 restricting or halting the use of "controlled burns" on DOE lands, after such a prescribed burn led to a

large uncontrolled wildfire in the southwestern United States. The record presumably refers to an uncontrolled wildfire in Los Alamos, New Mexico, that burned in the Spring of 2000.

## C. *Post-Wildfire Documents*

After the 24 Command Fire, both the FWS and DOE conducted internal investigations and issued detailed reports[4] to "evaluate the actions taken to manage the wildfire, present findings, and offer constructive recommendations," as well as to "provid[e] information for use in improving DOE response to fire incidents across the agency's national complex."

The reports contain disclaimers regarding their use.[5] They were obviously prepared for remedial purposes. But they do make some conclusions that Plaintiffs point to as some indication of negligence and responsibility. The FWS Report made a general finding that "[t]here were not adequate agreements or operating plans in place to enhance safe, effective, and efficient fire protection." It found:

> Agreements were unclear or were inadequate. Local fire districts appear to believe that [FWS] philosophy and policy restrict the use of certain tactics and that Federal wildland fire suppression activities would cease at the Federal land boundary. Both of these perceptions were unfounded based on review of

---

[4]An "FWS Interagency Fire Team Report of September 2000" and a "DOE Type B Accident Investigation Report of October 2000."

[5]The DOE Report states:

The discussion of fact, as determined by the [Accident Investigation] Board, and the views expressed in the report do not assume and are not intended to establish the existence of any duty at law on the part of the U.S. Government, its employees or agents, contractors, their employees or agents, or subcontractors at any tier, or any other party.

This report neither determines nor implies liability.

existing policy, current agreements, and actions taken during the incident.

The FWS report thus could be alluding to the reasons for the lack of maintenance of SR-24 firebreaks (i.e., HFD leaving matters to the State after 1995 as a result of the creation of "fugitive dust").

The DOE Report was more specific. It indicates, among other things, that

> the Board found that the lack of maintenance of defensible firebreaks along state highways allowed the fire to spread quickly onto the ALE Reserve. The Board found that RL [Richland DOE office], ORP [DOE Office of River Protection], and the contractors need to engage and coordinate with local clean air authorities, state regulators, the DOE-HQ Office of Environmental Health (EH), and the WSDOT [State Department of Transportation] to evaluate the most effective means of establishing defensible space along state right-of-way shoulders between State Routes 24 and 240 and the DOE fenceline.

It made the following analysis regarding fire barriers:

> While [a precut fire break between SR 24 and the DOE fenceline] was last time in place in 1995, it was not maintained along the entire lengths of SR 24, and vegetation reseeded enough to yield readily available fuel. . . . Maintenance of this barrier may have prevented the fire that started on the highway from igniting the natural vegetation on the ALE Reserve.[6]

---

[6]HFD Fire Chief Good disagreed with the conclusion, indicating that it was speculation. He testified in his deposition that "there's no way to tell whether that fire would have been stopped by that firebreak being maintained or not being maintained. . . . I've seen fire jump the [Columbia] River, I've seen fire jump the Yakima River, I've seen fire jump four-lane highways." His observations may well be sound, but this litigation never reached a stage to decide issues regarding causation.

Plaintiffs point to these reports as indicating that the DOE or FWS (or both) was negligent in failing to maintain firebreaks around SR-24.

As a further indication of DOE control or responsibility for firebreak maintenance around SR-24, Plaintiffs also point to an easement granted shortly after the 24 Command Fire (in November of 2000) by DOE to Touch America for fiber optic cables. That easement requires Touch America to conduct certain "fire stabilization measures:"

> [Touch America] agrees to complete the following fire stabilization measures along State Highway 24 . . . 1) smooth soil surface where disturbed by the installation of fiber optic conduit bundle, 2) mow vegetation on both sides of State Highway 24 from fence to shoulder of road, 3) apply a one time application of herbicides on both sides of State Highway 24 from fence to shoulder of road. . . . The type of herbicides and method of application will be determined by DOE. [Touch America] agrees to contact the DOE to coordinate installation of the fiber optic conduit bundle and fire stabilization measures.

According to Don Good, the HFD was not involved in negotiating any aspect of that easement.

Finally, as another alleged indicator of DOE control of the firebreaks near SR-24, Plaintiffs point to a post-wildfire internal DOE memorandum discussing fire recovery actions and plans. The memorandum discusses firebreaks along SR-240 and SR-24, indicating that "[t]he firebreaks [on SR-240] have been neglected since 1995 contributing (in the opinion of some investigators) to the most recent fire spread." It goes on to indicate an "immediate plan" of herbicide applications. As for SR-24, the memorandum states "the 32 miles of SR 24 represents a bigger problem at this time. Mostly unburned, but also neglected, it accommodates a heavy fuel load in both our

[DOE] view and in the view of [FWS]." The DOE memorandum recommends:

> 1. . . . that the Firebreaks be maintained annually and in the future budgeted properly by the Landlord organization. . . . As long as the U.S. DOE has responsibility for SR 240 and SR 24, this will amount to about $400,000 to $500,000 per year. . . .
>
> 2. The US DOE needs to seriously consider divesting itself of SR 240 and SR 24 while still ensuring that the Firebreaks are properly maintained[.]

Plaintiffs essentially contend that the memorandum indicates that DOE (not the HFD as indicated in the relevant contracts) still had substantial responsibility for SR-24 firebreak maintenance, and that such maintenance was not solely contractor responsibility.

## II.  PROCEDURAL HISTORY

Plaintiffs filed an administrative claim on June 3, 2002, with the DOE and FWS, seeking over $100 million in damages from the wildfire. Neither agency issued a final disposition of the claim within six months. *See* 28 U.S.C. § 2675(a) ("The failure of an agency to make final disposition of a claim within six months after it is filed shall . . . be deemed a final denial of the claim"). Accordingly, on December 23, 2002, Plaintiffs filed suit against the United States under the FTCA. The Plaintiffs include many individuals, some insurance companies with subrogated claims, a neighboring ranch, as well as Benton County.

On January 15, 2004, the district court granted the United States' motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or in the alternative, for summary judgment. The district court applied summary judgment standards and found as a matter of law that the

independent-contractor exception barred suit. *See* 28 U.S.C.
§ 2671 ("As used [in the FTCA] the term 'Federal agency' . . .
does not include any contractor with the United States");
*United States v. Orleans*, 425 U.S. 807 (1976). The court also
found, in the alternative, that the discretionary-function
exception under 28 U.S.C. § 2680(a) barred the suit.

Given those rulings, the district court did not need to rule
on pending questions regarding whether the United States had
a duty under state law to undertake fire prevention duties. It
also did not rule on questions involving proximate causation
(presumably whether a lack of maintenance was a proximate
cause of Plaintiffs' damages).

Judgment was entered in favor of the United States and a
timely notice of appeal followed.

## III.   DISCUSSION

### A.   *Standards of Review*

The court reviews de novo subject matter jurisdiction deter-
minations under the FTCA. *Bramwell v. United States Bureau
of Prisons*, 348 F.3d 804, 806 (9th Cir. 2003). "The district
court's findings of fact relevant to its determination of subject
matter jurisdiction are reviewed for clear error." *Ass'n of Am.
Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir.
2000).

With a 12(b)(1) motion, a court may weigh the evidence to
determine whether it has jurisdiction. *See Roberts v. Corro-
thers*, 812 F.2d 1173, 1177 (9th Cir. 1987). However, where
— as is the case here — "the jurisdictional issue and substan-
tive claims are so intertwined that resolution of the jurisdic-
tional question is dependent on factual issues going to the
merits, the district court should employ the standard applica-
ble to a motion for summary judgment." *Rosales v. United
States*, 824 F.2d 799, 803 (9th Cir. 1987).

"This court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003) (en banc) (citation omitted). The Court "must therefore determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 1131-32 (citation omitted). "The court must not weigh the evidence or determine the truth of the matters asserted but must only determine whether there is a genuine issue for trial." *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

B.   *The Independent-Contractor Exception*

**[1]** Under the FTCA's limited waiver of sovereign immunity, the United States is liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). *See also* 28 U.S.C. § 2674 ("the law of the place where the act or omission complained of occurred"). The FTCA includes officers and employees of "any federal agency" but expressly excludes "any contractor with the United States." 28 U.S.C. § 2671. "[T]he critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the 'detailed physical performance' and 'day to day operations' of the contractor." *Hines v. United States*, 60 F.3d 1442, 1446 (9th Cir. 1995) (citations omitted).

Federal law determines whether an individual is a federal employee. *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995). Common law agency principles are also instructive in determining whether one is a contractor or an employee. *E.g.*, *Logue v. United States*, 412 U.S. 521, 526-27 (1973); *Will v. United States*, 60 F.3d 656, 659 (9th Cir. 1995). "Courts are

not free to 'abrogate the [independent-contractor] exemption'
for the negligent acts of contractors regardless of whether
there is a good reason for so doing." *Hines*, 60 F.3d at 1447
(quoting *Logue*, 412 U.S. at 528).

**[2]** Contractual provisions directing detailed performance
generally do not abrogate the contractor exception. The
United States may "fix specific and precise conditions to
implement federal objectives" without becoming liable for an
independent contractor's negligence. *Orleans*, 425 U.S. at
816. "Neither do standards that are designed to secure federal
safety objectives convert the agent into an employee." *Hines*,
60 F.3d at 1447 (citation omitted). "[D]etailed regulations and
inspections are [not] evidence of an employee relationship."
*Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)
(citations omitted). That is, "the ability to compel compliance
with federal regulation does not change a contractor's person-
nel into federal employees." *Id.* (citations omitted). Rather,
"[t]here must be substantial supervision over the day-to-day
operations of the contractor in order to find that the individual
was acting as a government employee." *Id.* (citation omitted).

**[3]** Applying these standards, Plaintiffs cannot dispute that
Fluor and DynCorp and HFD are government contractors.
Moreover, all indications are that the government did not
direct the actual *performance* of the contract (e.g., how to
fight the fires, or how to disc the soils, or how to conduct a
controlled burn). Plaintiffs don't argue, and the complaint
does not allege, that the government supervised or directed (or
negligently supervised or directed) day-to-day operations of
HFD as to maintaining firebreaks on the ALE near SR-24 so
as to render any HFD employee a *de facto* government
employee.

Rather, Plaintiffs contend that, at least after the 1997 MOU,
there was no contractual provision at all specifically for fire
prevention or firebreak maintenance on the ALE. By its
terms, the 1997 MOU between the DOE and FWS gave

responsibility for "fire protection" to the FWS. Paragraph 4.3 of the MOU provided in part that "*FWS* will be responsible for coordination of the . . . fire protection, emergency preparedness, and . . . general maintenance and administration for the ALE." (Emphasis added). Similarly, paragraph 5.5 provided that "Until FWS has developed its own approved management plan and has upgraded its own fire protection capabilities for the ALE, *the appropriate DOE-RL POC . . . is responsible for providing FWS fire protection*, including initial attack and incident management, for ALE structures and wildlands, on a cost reimbursable basis from FWS." (Emphasis added.) Although the transition from DOE to FWS was not yet complete, under the MOU's terms, the United States still maintained responsibility.

[4] The problem for Plaintiffs is that the DOE contract with Fluor and Fluor's subcontract with HFD were still in place. The MOU between DOE and FWS, even if it changed responsibility for management of the ALE, did not change those contracts. The continuation of the contracts indicates that the DOE had still delegated the same responsibilities to its contractors, even after the management change. Plaintiffs respond, however, by arguing that the subsequent notifications in letters to Fluor and HFD — that after the management change Fluor and HFD should "continue to provide *fire protection services* . . . to the ALE on a cost reimbursable basis" — also indicated that FWS (or the DOE) would now be responsible for other fire prevention and maintenance.

Plaintiffs point to language in the subsequent 1998 Cooperative Agreement directly between FWS and HFD and contend that the agreement only covers "fire fighting" and *not* "fire prevention" or other maintenance such as firebreaks near the ALE. In particular, Plaintiffs point to the agreement's "Scope" section and contend that there is nothing indicating that HFD is responsible for "fire *prevention*" duties, in general, nor for firebreak maintenance on the ALE or around SR-24, in particular. On the other hand, the government points to

the "Purpose" section, which indicates the Cooperative Agreement is for "fire protection and wildfire suppression."

To support their argument that the Cooperative Agreement deals only with actual "firefighting," Plaintiffs point to the deposition testimony of Don Good, where he acknowledges that "fire protection" and "fire prevention" are different from "fire fighting." They rely on his testimony where he says "HFD doesn't do any fire prevention" or "fire protection" for FWS.

Plaintiffs also point to the contractor-produced 1993 ALE Facility Management Report. They contend that compliance with the 1993 report was a requirement of the MOU, and was not merely "guidance" as the document indicates. Section 4.2.7 of the 1993 report says "All *fire fighting* is the responsibility of [HFD]" but then says "*The ALE facility manager* will periodically review the fire prevention and fire fighting plans with the [HFD], ensuring that facility users take appropriate steps to minimize the possibility of causing a fire[.]"

Plaintiffs' position, however, rests upon the proposition that, after the 1997 MOU, there no longer was a contractual provision in place between the DOE and Fluor (and, in turn, HFD) regarding fire prevention (or any other pre-MOU duty besides "fire protection services").

Nevertheless, it is plain that "fire prevention" and "fire protection system . . . maintenance" are included within the terms of the relevant contracts. Even assuming there was a specific requirement or expectation that firebreaks in particular would be maintained, such maintenance fits squarely within the contractual responsibilities. Further, contrary to the Plaintiffs' position, the MOU between the DOE and FWS did not alter the terms and obligations of Fluor in its contract with DOE, or of DynCorp (HFD) in its corresponding subcontract with Fluor. The July 17, 1997, letter from DOE to Fluor (and the similar October 6, 1997, letter from Fluor to DynCorp) are

effectively nothing more than official acknowledgments to Fluor and DynCorp of the signing of the MOU and confirmations that the MOU did not change existing contractual duties. There is no evidence that those letters indicated any intent to modify existing contractual agreements between the DOE and Fluor. (Indeed, the letters confirmed that duties would *continue* even after the MOU.) And by the MOU's very terms, the management change had not yet occurred; an approved management plan had to be approved before FWS assumed control of the ALE. The independent-contractor exception to the FTCA applies here.

The testimony of Don Good that "we don't do any fire prevention for U.S. Fish and Wildlife," even taken out of context, does not create a material dispute of fact regarding the contractual duties. At best for Plaintiffs (as indicated in the post-wildfire reports), and construing evidence in their favor as is required at a summary judgment stage, there was confusion regarding the scope of duties specifically as to firebreak maintenance. But, even assuming so, it only indicates a potential issue regarding contractual *performance*. The independent-contractor exception to the FTCA would still apply.

The Plaintiffs' theory of negligence was premised upon a failure to maintain firebreaks along SR-24. The government argues, however, that there is no duty of a landowner as a matter of law specifically to utilize firebreaks in all circumstances. We need not reach this argument because, whether or not there was such a duty regarding firebreaks around SR-24, the contractual provisions plainly provide that "fire prevention" was delegated by the DOE (and FWS) to contractors. The contracts necessarily encompassed decisions about firebreaks as well.

## IV. CONCLUSION

[5] Fire protection and fire prevention were contracted by the government to Fluor and by Fluor to the HFD. These con-

tracts included duties, if any, regarding fire breaks. The 1997 management transfer of the ALE from the DOE to FWS did not modify those contracts. The independent-contractor exception bars this FTCA suit against the United States.

   **AFFIRMED.**