# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Michael D. Gannon, McDonnell Boehnen Hulbert & Berghoff LLP, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Michael H. Baniak, and Christina L. Brown.

Sharon R. Barner, Foley & Lardner LLP, of Chicago, Illinois, argued for defendant-appellee. With her on the brief were Jonathan R. Spivey and Michael R. Houston. Of counsel on the brief was Anat Hakim, of Washington, DC.

Appealed from: United States District Court for the Western District of Texas

Judge Lee Yeakel

# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Appeal from the United States District Court for the Western District of Texas in case no. 04-CV-352, Judge Lee Yeakel.

_____

DECIDED:  February 13, 2008

_____

Before NEWMAN, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, and DYK, <u>Circuit Judge</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Opinion dissenting in part and concurring in part filed by <u>Circuit Judge</u> NEWMAN.

DYK, <u>Circuit Judge</u>.

Appellant DDB Technologies, L.L.C. ("DDB") appeals from a decision of the United States District Court for the Western District of Texas.  The district court dismissed DDB's patent infringement suit against MLB Advanced Media, L.P. ("MLBAM") for lack of subject matter jurisdiction.  We hold that the district court correctly held that DDB's asserted statute of limitations and equitable defenses were not available and that no jury trial was required on the issue of standing.  However, we hold that the district court erred in denying DDB's request for jurisdictional discovery. Therefore we affirm in part and vacate in part the judgment of the district court, and we

remand for limited jurisdictional discovery and for further consideration of the district court's jurisdiction based on that discovery.

BACKGROUND

I

Plaintiff-Appellant DDB is a company formed by Dr. David Barstow and his brother Daniel Barstow. The two Barstow brothers were the named inventors of the patents in suit. Those patents include three "Computer Simulation Patents," U.S. Patent Nos. 5,526,479 ("'479 patent"), 5,671,347 ("'347 patent"), and 6,204,862 ("'862 patent"), all relating to a method for generating a computer simulation of a live event for display on a viewer's computer, and one "Pattern-Matching Patent," U.S. Patent No. 5,189,630 ("'630 patent"), relating to a method allowing a viewer to search for certain information about a live event. In 1998, the Barstow brothers assigned these patents to DDB, which they had formed to commercialize and further develop their inventions.

The ultimate question here is whether the interest of Dr. David Barstow ("Barstow") in these patents was previously assigned to his former employer, Schlumberger Technology Corporation ("Schlumberger").[1] Barstow, a computer scientist, worked for Schlumberger from 1980 until 1994. At the start of his employment, Barstow entered into an employment agreement that included the following relevant provisions:

> 3. Employee shall promptly furnish to Company a complete record of any and all technological ideas, inventions and improvements, whether patentable or not, which he, solely or jointly, may conceive, make or first disclose during the period of his employment with [Schlumberger].

---

[1] There is no contention that Daniel Barstow's interest was assigned to Schlumberger. All of Daniel Barstow's interest was assigned to DDB.

4.  Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements coming within the scope of Paragraph 3:

   a) <u>which relate in any way to</u> the business or activities of [Schlumberger], or

   b) <u>which are suggested by or result from</u> any task or work of Employee for [Schlumberger], or

   c) which relate in any way to the business or activities of Affiliates of [Schlumberger],

together with any and all domestic and foreign patent rights in such ideas, inventions and improvements. Employee agrees to execute specific assignments and do anything else properly requested by [Schlumberger], at any time during or after employment with [Schlumberger], to secure such rights.

J.A. at 470-71 (emphasis added).

During his employment with Schlumberger, Barstow worked on several projects related to the development of computer software used to control and record data measured by physical sensors used in logging oil wells, and on other software development projects. Barstow also worked on several personal projects during that time period, including collaborating with his brother Daniel on a method for broadcasting data about a live event, such as a baseball game, and producing a simulation of that event to be viewed on a computer. This project eventually led to the applications for the four patents in suit, two of which were filed and one of which was issued during Barstow's employment with Schlumberger.

While employed at Schlumberger, Barstow discussed this project with Charles Huston, Schlumberger's general counsel for software matters, and Dr. Reid Smith, the director of the lab in which Barstow worked. Both Huston and Smith testified that they knew Barstow was working on a "baseball simulator" project, J.A. at 153, that they had

discussed the project with Barstow and also between themselves, and that they did not believe at the time that the project belonged to Schlumberger. Huston stated, "Dave came to Re[i]d and myself and said this is what I'm doing. If there is any problem with this let me know and Re[i]d and I discussed it and we don't see how it applies to Schlumberger's business." J.A. at 154. Smith testified that Barstow's project was "general knowledge" at Schlumberger, that he had never "suggest[ed] to Dr. Barstow that the personal work he was doing belonged to Schlumberger," and that he was not "aware of anyone at Schlumberger ever stating a belief that Dr. Barstow's personal work belonged to Schlumberger." J.A. at 165-66. However, the extent of Huston and Smith's knowledge of the project is unclear from the record.

The only written communication from Barstow produced at the hearing was an e-mail sent from Barstow to Smith requesting permission to "include a short biography of [Barstow] in the biographical section" on a product resulting from a "project of [his] brother's . . . involv[ing] a scheme for recording symbolic descriptions of baseball games . . . and providing software for home computers that would do things like simulation and search." J.A. at 965. Barstow also advised Smith that "some patents may issue this year, in both of our names," and promised to "let [Smith] know if it actually happens." Id. Smith forwarded the e-mail to Huston, who wrote back, "I see no problem with Dave having his biography included if he is a coauthor of the work." Id. Although Huston testified that he did not think Barstow "concealed details of his personal project," J.A. at 153, he also admitted that he did not recall any documentation about the project, other than the e-mail, being provided. Similarly, Smith stated that he did not know what other documentation about the project Barstow had provided to others at Schlumberger.

II

In 2004, DDB filed this patent infringement action against MLBAM, alleging that MLBAM provides several Internet services related to baseball that infringe the Computer Simulation Patents and the Pattern-Matching Patent. More than a year later, immediately before the close of discovery, MLBAM entered into negotiations with Schlumberger to acquire any interest that Schlumberger had in the patents in suit. Several months later, on April 7, 2006, Schlumberger and MLBAM entered into an agreement that assigned to MLBAM all of Schlumberger's rights and interest in the patents in suit and granted MLBAM a retroactive license to practice under those patents.

On May 1, 2006, MLBAM moved the district court to dismiss the action for lack of subject matter jurisdiction, based on DDB's failure to join all owners of the patents in suit (including MLBAM) and on DDB's inability to pursue an infringement claim against MLBAM by virtue of its newly acquired ownership interest in those patents. DDB subsequently filed a motion to extend the briefing schedule and to obtain limited expedited discovery and depositions on the issues raised by MLBAM's motion to dismiss. MLBAM indicated that it would agree to a thirty-day extension for "reasonable discovery," J.A. at 892, although it now disputes the extent of the discovery it was willing to provide. Nonetheless, the district court denied DDB's discovery motion, and scheduled a hearing on the motion to dismiss for June 8, 2006. The court held a telephonic conference to determine whether the parties would be allowed to present witness testimony at the hearing, and ultimately decided to allow each party thirty minutes and to use part of its thirty-minute argument time to present witness testimony.

At the hearing, DDB used its time to present the testimony by Huston and Smith described above. MLBAM presented testimony by Dale Gaudier, Schlumberger's general patent counsel, about the nature of Schlumberger's business at the time Barstow worked for the company.

On September 26, 2006, the district court granted MLBAM's motion to dismiss. The court found that the patents in suit fell within the scope of Barstow's employment agreement because they were both "suggested by" and "related to" his work for Schlumberger. In determining that the patents in suit were "suggested by" Barstow's work, the district court relied particularly on their relation to two prior patents issued to Schlumberger that named Barstow as the inventor. During the prosecution of three of the four patents in suit, one of these patents was listed by the patent examiners as prior art (although not cited by the applicant as prior art). In determining that the patents in suit were "related to" Barstow's work, the court relied in part on a 1992 letter from Barstow to his brother Daniel which the district court interpreted as an admission by Barstow of such a relation. Because the language of the employment agreement provided for an automatic assignment of Barstow's rights, the court rejected DDB's statute of limitations, waiver, estoppel, and laches defenses. The court also held that the equitable defenses were not available because Barstow had not complied with the disclosure requirements of Paragraph 3 of the employment agreement. Having concluded that Schlumberger, and thereafter MLBAM, was a co-owner of the patents, the court determined that it lacked subject matter jurisdiction because DDB had not joined Schlumberger and could not join MLBAM. See Israel Bio-Eng'g Project v. Amgen Inc., 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) ("Absent the voluntary joinder of all co-

owners of a patent, a co-owner acting alone will lack standing.").[2]  The court did not

address whether DDB was entitled to a jury trial on the disputed jurisdictional facts.

DDB timely appealed the district court's dismissal to this court.  We have

jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

The district court's decision as to the lack of subject matter jurisdiction is a

question of law that we review de novo.  See Pennington Seed, Inc. v. Produce Exch.

No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006).  We review the district court's

underlying factual determinations for clear error.  See Plumtree Software, Inc. v.

Datamize, LLC, 473 F.3d 1152, 1158 (Fed. Cir. 2006).

I

DDB first argues that, even if the patents in suit were within the scope of the

employment agreement, Schlumberger's claim of ownership is barred by the statute of

limitations; that Schlumberger has waived any claim of ownership it may have had

through its long period of inaction in asserting an interest in the patents in suit; and that

Schlumberger is subject to estoppel by laches based on its unreasonable delay in

---

[2]  Contrary to the dissent, we have explicitly held that Rule 19 does not permit the involuntary joinder of a patent co-owner in an infringement suit brought by another co-owner.  See Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 1998) ("[A]s a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit.") (emphasis added). Ethicon notes two exceptions, neither of which is applicable to this case:  (1) an exclusive licensee may join the patent owner as an involuntary plaintiff in an infringement suit, see Independent Wireless Telegraph Co. v. Radio Corp. of America, 269 U.S. 459, 469 (1926); and (2) a co-owner who, by agreement, waives his right to refuse to join suit, may be forced to join an infringement suit, see Ethicon, 135 F.3d at 1468 n.9.  Notably, the appellant does not assert that MLBAM could be joined as an involuntary plaintiff.

asserting its rights. DDB also argues estoppel by acquiescence based on Schlumberger's implicit and explicit assurances that the patents belonged to Barstow, and equitable estoppel based on Barstow's reliance on communications from Schlumberger that led him to believe the company was not claiming rights in the patents. The district court determined that the assignment under the agreement was automatic, and that under such circumstances Texas law precluded the assignor from asserting waiver, estoppel by acquiescence, and equitable estoppel against the assignee. See DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 465 F. Supp. 2d 657, 669 (W.D. Tex. 2006); Johnson v. Structured Asset Servs., Inc., 148 S.W.3d 711, 722 (Tex. App. 2004) ("An assignor cannot urge estoppel or waiver against his assignee after making a valid assignment."); Univ. of Tex. Med. Branch v. Allan, 777 S.W.2d 450, 453 (Tex. App. 1989). DDB does not dispute that state law would bar these defenses if there had been an automatic assignment; rather, it urges that there was no automatic assignment.

We must first determine whether the question of automatic assignment is governed by federal or state law. Although state law governs the interpretation of contracts generally, see Thatcher v. Kohl's Department Stores, Inc., 397 F.3d 1370, 1373 (Fed. Cir. 2005), the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases. We have accordingly treated it as a matter of federal law. See Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed. Cir. 2000); Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1580-81 (Fed. Cir. 1991); cf. Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002)

(holding that bona fide purchaser defense is governed by federal law). Applying federal law, we have held that whether an assignment of patent rights in an agreement such as the one in this case is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language. If the contract expressly grants rights in future inventions, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law." FilmTec, 939 F.2d at 1573 (contract provided that inventor "agrees to grant and does hereby grant" all rights in future inventions); see also Speedplay, 211 F.3d at 1253 (contract provided that employee's inventions within the scope of the agreement "shall belong exclusively to [employer] and [employee] hereby conveys, transfers, and assigns to [employer] . . . all right, title and interest in and to Inventions"). Contracts that merely obligate the inventor to grant rights in the future, by contrast, "may vest the promisee with equitable rights in those inventions once made," but do not by themselves "vest legal title to patents on the inventions in the promisee." Arachnid, 939 F.2d at 1581 (contract provided that, for inventions within the scope of the agreement, "all rights . . . will be assigned by [inventor] to CLIENT").

Paragraph 4 of Barstow's employment agreement with Schlumberger stated that Barstow "agrees to and does hereby grant and assign" all rights in future inventions falling within the scope of the agreement to Schlumberger. J.A. at 471 (emphasis added). This contractual language was not merely an agreement to assign, but an express assignment of rights in future inventions.[3] The district court therefore correctly

---

[3] DDB argues that the employment agreement itself contemplated an additional act of assignment, and that reading the agreement to create an automatic assignment is therefore inappropriate. DDB relies on the clause in the agreement that

determined that, if the patents in suit were within the scope of the employment agreement, they would have been automatically assigned to Schlumberger by operation of law with no further act required on the part of the company. Accordingly, DDB's statute of limitations, waiver, and estoppel defenses have no merit.

We turn then to the question whether the employment agreement covered the patents in suit because they "relate in any way to the business or activities" of Schlumberger, or "are suggested by or result from" Barstow's work for Schlumberger. Those issues, of course, are governed by Texas law.

II

The sole jury trial issue in this case concerns whether DDB is entitled to a jury trial on the jurisdictional issue of standing. We hold that it is not. DDB argues that, because the jurisdictional issue and the merits of the case are intertwined, the district court should not have dismissed the case on jurisdictional grounds without a jury trial on the merits as to the question of whether the contract provided for assignment of the patents in suit. Because the question of a patentee's right to a jury trial "implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction, i.e., patent law," Gardco Manufacturing, Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed. Cir. 1987), we apply our own law rather than the law of the regional circuit. The right to a jury trial on disputed jurisdictional facts that also implicate the merits of plaintiff's cause of action is an issue of first impression for this court.

---

states: "Employee agrees to execute specific assignments and do anything else properly requested by Company, at any time during or after employment with Company, to secure such rights." J.A. at 471. We see nothing in this clause that conflicts with the clear language of the present, automatic assignment provision in the agreement.

Most of the regional circuits look to the degree of intertwinement between the jurisdictional facts and the facts underlying the merits of the cause of action to determine whether dismissal on jurisdictional grounds is appropriate, or whether resolution of the issues must await summary judgment proceedings or trial on the merits. See, e.g., Torres-Negrón v. J&N Records, LLC, 504 F.3d 151, 163 (1st Cir. 2007) (whether jurisdictional and merits issues are "distinct and independent").[4] We agree with the majority of the regional circuits that the degree of intertwinement of jurisdictional facts and facts underlying the substantive claim should determine the appropriate procedure for resolution of those facts. This inquiry can present complex questions. In this case, however, we think that the interpretation of the employment agreement, which depends in part on state contract law and in part on this circuit's law

---

[4]    See also Autery v. United States, 424 F.3d 944, 956 (9th Cir. 2005) (whether "jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits") (citation omitted); Morrison v. Amway Corp., 323 F.3d 920, 926 (11th Cir. 2003) (whether same statute provides basis for both subject matter jurisdiction and substantive claim for relief); Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002) ("[T]he underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.") (citation omitted); London v. Polishook, 189 F.3d 196, 198 (2d Cir. 1999) (whether "jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits") (citation omitted); United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999) ("[W]hile the merits and jurisdictional questions are not identical, they are so closely related that the jurisdictional issue is not suited for resolution in the context of a motion to dismiss for lack of subject matter jurisdiction."); Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (whether "the jurisdictional issue is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue'") (citation omitted); Weidner Commc'ns, Inc. v. H.R.H. Prince Bandar Al Faisal, 859 F.2d 1302, 1310 n.11 (7th Cir. 1988) ("call[ing] to the attention of the district court" on remand a Ninth Circuit case holding that "where jurisdictional issues and substantive issues are so intertwined that the issue of jurisdiction is dependent on resolution of factual issues going to the merits," dismissal on jurisdictional grounds is inappropriate); Eubanks v. McCotter, 802 F.2d 790, 793 (5th Cir. 1986) (whether "the [same] statute provides both the basis of federal court subject matter jurisdiction and the cause of action") (citation omitted).

regarding patent assignment clauses, is not so intertwined with the substantive federal patent law governing DDB's infringement claims and MLBAM's invalidity counterclaims that dismissal on jurisdictional grounds would be inappropriate. We therefore reject DDB's argument that the district court erred by holding a preliminary hearing, rather than awaiting jury trial on the merits, to resolve the jurisdictional issues. Although we hold that DDB has no right to a jury trial on the issue of standing, there of course remains a right to jury trial on other appropriate issues in the case.

III

DDB also argues that the district court erred by not granting its motion for jurisdictional discovery before dismissing on jurisdictional grounds. In general, "[w]e review the district court's denial of additional discovery, an issue not unique to patent law, for abuse of discretion, applying the law of the regional circuit." Digeo, Inc. v. Audible, Inc., 505 F.3d 1362, 1370 (Fed. Cir. 2007). However, "[i]n determining the relevance of a request for jurisdictional discovery, we apply Federal Circuit law." Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp., 395 F.3d 1315, 1323 (Fed. Cir. 2005). In this case, the limited jurisdictional discovery requested by DDB clearly was relevant to the existence of subject matter jurisdiction.

Plainly, the employment agreement is ambiguous as to what is "related to" or "suggested by" Barstow's work for Schlumberger, because resort to extrinsic evidence, for example, as to the nature of Schlumberger's business or to that of Barstow's work, is necessary to determine whether the provision applies. DDB argues that the patents in suit are not within the scope of these terms because Schlumberger's business and Barstow's work for Schlumberger during the 1980 to 1994 period involved controlling

and recording data from physical sensors used in the oil business, whereas the patents in suit describe a technique for broadcasting information about live events, such as sporting events, using a computer simulation. MLBAM, with equal fervor, argues that the patents in suit are covered by the agreement.

Under both Texas contract law and general contract law, when a contract is ambiguous, "[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract may . . . be considered in determining the parties' true intent." Consolidated Eng'g Co. v. S. Steel Co., 699 S.W.2d 188, 192-93 (Tex. 1985); see also 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:14 (4th ed. 1993) ("[T]he parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court."). Here, evidence that the parties during performance agreed that Barstow's work leading to the patents in suit was not covered by the agreement would be highly relevant, if not dispositive.

At the hearing on MLBAM's motion to dismiss, DDB presented witness testimony suggesting that Schlumberger knew about Barstow's work on the project leading to the patents in suit, considered whether it fell within the scope of the employment agreement, and concluded that it did not. Charles Huston, Schlumberger's in-house counsel for software matters from 1990 to 1995, testified that he knew Barstow was working on a personal project related to computer simulations of baseball games, that he had discussed the project with Dr. Reid Smith, the director of the laboratory in which Barstow worked, and that they had concluded that it did not apply to Schlumberger's business. Likewise, Dr. Smith testified that neither he nor anyone else at Schlumberger

had ever suggested that Barstow's project belonged to the company. Barstow testified by declaration that he had discussed the project several times with Huston and Smith, and that "[n]o one from Schlumberger, including Mr. Smith, and Mr. Huston ever told [him] that the DDB patented techniques belonged to Schlumberger." J.A. at 951. Moreover, during the period from 1994, when Barstow left Schlumberger, until September 2005, when MLBAM contacted the company to initiate negotiations for an assignment of rights, Schlumberger did nothing to indicate that it believed it had an ownership interest in the patents in suit.

However, Schlumberger's view that the agreement did not apply (and its silence) would only be significant if Schlumberger had been aware of the nature of Barstow's project. The crucial question thus was the extent of Schlumberger's knowledge of the project at the time that the company's officers concluded that the project was not within the scope of the agreement. The problem is that DDB was denied discovery on this central issue. MLBAM filed its motion to dismiss on May 1, 2006, several months after the close of discovery. DDB on May 12, 2006, filed a motion to extend the discovery period and for limited jurisdictional discovery. The motion listed several categories of pertinent documents, including those related to "Schlumberger's ownership interest in [the patents in suit]," "[c]ommunications between Dr. David Barstow and Schlumberger, including those pertaining to inventions of Dr. David Barstow," "[a]ny agreements between Dr. David Barstow and Schlumberger including, but not limited to, any employment agreement," and "[a]ny alleged breach of any agreements between Dr.

David Barstow and Schlumberger."[5]  J.A. at 886.  On the same day, MLBAM's counsel indicated by e-mail to counsel for DDB that it would "agree to extend 30 days for reasonable discovery and will work with you if there needs to be a slightly longer extension."  J.A. at 892.  DDB then, inter alia, filed a subpoena for Schlumberger, seeking documents and Rule 30(b)(6) deposition on a variety of pertinent subjects.  The district court denied the discovery motion on May 18, 2006.

DDB's discovery requests could have led to the production of documents (if they existed) such as copies of the applications for the patents in suit in Schlumberger's files, notes of conversations by Schlumberger employees demonstrating the extent of the company's knowledge of the inventions, further communications between Barstow and Schlumberger regarding the inventions, or communications as to whether Schlumberger's officers or employees believed that Schlumberger had an ownership interest in those inventions.[6]

---

[5]  MLBAM argues that this document discovery would have been futile, because its witness, Dale Guadier, testified at the hearing that "even before DDB's subpoena, a search was made and no additional documents were located."  Br. of Def.-Appellee at 20 n.10.  This is not an accurate characterization of Gaudier's testimony.  Although Gaudier testified that he had not found "any other documentation regarding the technology at issue," J.A. at 138, he also clearly testified that he had seen the list of documents requested by DDB in its subpoena but did not "go through and try to find all the documents that are described . . . in [that] schedule of documents."  Id. at 143.  Gaudier did state that he had not found an agreement assigning patent rights from Schlumberger back to Barstow, but if Schlumberger had never believed it had any rights in the patents in suit, no such document would be expected to exist.

[6]  This discovery would also have been relevant to the question of whether Barstow complied with his obligation under the employment agreement to provide Schlumberger with a complete record of his inventions.  We need not decide how or whether Barstow's breach of the agreement would in any way affect Schlumberger's rights under the agreement if it had nonetheless been fully aware of the nature of Barstow's work.

The question is whether the district court's refusal to grant that discovery was an abuse of discretion. In cases where the jurisdictional and merits issues are intertwined but separable, the Fifth Circuit has explained that "the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." Williamson v. Tucker, 645 F.2d 404, 414 (5th Cir. 1981); see also McLain v. Real Estate Bd. of New Orleans, 583 F.2d 1315, 1323 n.9 (5th Cir. 1978) (explaining that "[t]he effective use of discovery is a crucial feature of this case," where "the issues necessarily determinative of jurisdiction can be isolated and explored through discovery"), vacated on other grounds, 444 U.S. 232 (1980).[7]

In general we give substantial deference to a district court's decisions on issues of discovery. However, under the circumstances of this case, given the central relevance of the information sought in discovery, it was an abuse of discretion for the district court to deny DDB jurisdictional discovery, including document and deposition requests. See, e.g., McAllister v. FDIC, 87 F.3d 762, 766 (5th Cir. 1996) (district court abused its discretion in denying discovery on jurisdictional issue); see also Commissariat à l'Energie Atomique, 395 F.3d at 1323-24 (same). On remand, the district court should allow DDB to conduct reasonable discovery relevant to the issue of whether the patents in suit fall within the scope of Barstow's employment agreement

Further discovery might also shed light on the significance of Barstow's statement in his November 1992 letter to his brother that "[i]t's curious how [the project] and my Schlumberger work go hand in hand." J.A. at 842.

[7]     Other circuits have said that when jurisdictional facts are in dispute, "a refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant." Sizova, 282 F.3d at 1326; see also Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990); Majd-Pour v. Georgiana Cmty. Hosp., Inc., 724

with Schlumberger. We do not here attempt to specify exactly which discovery the district court should allow; the district court is in a far better position to make such determinations than are we. If such discovery in this case produces relevant and material evidence, a new hearing may be required with additional witness testimony.

Because we hold that further jurisdictional discovery was warranted, we do not reach the issue of whether the district court correctly held on the previous record that the patents in suit fell within the scope of Barstow's employment agreement with Schlumberger.

## CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the district court's decision, and we remand for further proceedings in accordance with this opinion.

## AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

## COSTS

No costs.

---

F.2d 901, 903 (11th Cir. 1984); Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.24 (9th Cir. 1977).

# United States Court of Appeals for the Federal Circuit

2007-1211

DDB TECHNOLOGIES, L.L.C.,

Plaintiff-Appellant,

v.

MLB ADVANCED MEDIA, L.P.,

Defendant-Appellee.

Appeal from the United States District Court for the Western District of Texas in case no. 04-CV-352, Judge Lee Yeakel.

NEWMAN, <u>Circuit Judge</u>, dissenting in part, concurring in part.

I do not object to the remand for additional discovery relevant to "the issue of whether the patents in suit fall within the scope of Barstow's employment agreement with Schlumberger." Maj. op. at 16. Although the testimony in the district court was undisputed that Schlumberger agreed that the Barstow inventions concerning computerized replays of sporting events were not within the scope of Barstow's employment obligations, it may be that further discovery will ameliorate the doubts that apparently concern my colleagues.

I write separately because several aspects of the majority opinion embody errors of law, substantive and procedural. Thus the panel majority rules prematurely that the issues of "the asserted statute of limitations and equitable defenses were not available and that no jury trial was required," maj. op. at 1, even as the case is remanded for discovery that is directly related to these issues. Other errors include the ruling that determination of Dr. Barstow's rights and obligations under his employment agreement is preempted by federal law because "standing" is involved, although disputes arising from employment

agreements are and have always been a matter of state law.  In addition, the ruling against the jury role is gratuitous and premature, for there was no such ruling by the district court, and it is not yet known if the employment agreement issue may require trial.  The court also errs in its ruling negating the procedures of the Federal Rules to join involuntary parties if those parties are necessary to the action.  Further, the court improperly designates various merits issues as "jurisdictional."  These complex areas require greater depth and clarity than are here dispensed.  I elaborate briefly on some of the flaws in the majority view:

***The Issues of Waiver, Estoppel, and Laches***

It is not disputed that during Dr. Barstow's employment the responsible Schlumberger officials agreed that the inventions relating to the computerized recall and replay of sporting events were not within the scope of his employment agreement.  In 2006, sixteen years after the first patent application was filed (in 1990), thirteen years after the first patent was issued (in 1993), and twelve years after Dr. Barstow left Schlumberger (in 1994), Schlumberger reportedly represented to the defendant MLB Advanced Media (MLBAM) that Schlumberger owns the Barstow inventions and the four patents thereon, including those filed after Dr. Barstow left Schlumberger.  Schlumberger did not assert that the Barstow inventions were for use in the Schlumberger oil and gas well business, but asserted ownership of the sporting events media inventions for sale to MLBAM, a sporting events media purveyor.  At the time the Barstow inventions originated and patent applications were filed, however, Schlumberger officials told Dr. Barstow, unequivocally, that these inventions were not within the scope of his employment obligations.  These statements were the subject of testimony in the district court, by the persons responsible at Schlumberger.

2007-1211                                     2

Testifying at the hearing in the district court, Dr. Reid Smith, Vice President and Director of the Schlumberger Laboratory for Computer Science from 1989 to 1994, at which Dr. Barstow was employed, answered "No" to the question of whether he is "aware of anyone at Schlumberger ever stating a belief that Dr. Barstow's personal work belonged to Schlumberger," and "No" to whether he ever "suggest[ed] to Dr. Barstow that the personal work he was doing belonged to Schlumberger."  Schlumberger's then patent counsel Charles Huston testified that Dr. Barstow "came to Reed [sic] and myself" regarding this invention and "Reed [sic] and I discussed it and we don't see how it applies to Schlumberger's business."  (The quotations are from the transcript of the hearing.)

In apparent conflict with its recognition of this undisputed testimony, the panel majority states that "evidence that the parties during performance agreed that Barstow's work leading to the patents in suit was not covered by the agreement would be highly relevant, if not dispositive."  Maj. op. at 13.  And despite now ordering additional discovery on these issues, the panel majority prematurely rules that "DDB's statute of limitations, waiver, and estoppel defenses have no merit."  Maj. op. at 10.  These conflicting positions do not add clarity to the procedures ordered on remand, for the issues of waiver and estoppel and laches may well be informed by this same further discovery.  The district court is not constrained from obtaining full exploration of these related issues, as well as determining, on the entirety of the evidence, the issues of employment obligations and ownership with respect to the inventions at issue.

**_Preemption of State law; the Jury Role_**

The panel majority acknowledges "state contract law", but announces that federal law preempts state law for employment contracts that include rights to patents, reasoning

that "[a]lthough state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and therefore is "a matter of federal law". Maj. op. at 8. That is grievous overreaching, as well as contrary to law and precedent.

Interpretation of employment contracts, including clauses establishing employer-employee obligations with respect to inventions and patents, is a traditional state matter. This is a quite different issue from "standing in patent cases," supra. The rule that a plaintiff must own the property on which he sues in federal court does not preempt the laws governing property ownership. The adjudication of property rights that arise from an employment agreement is not preemptively removed from state law when the agreement concerns patent property.

State statutory and common law have long been recognized as governing the ownership of patent property. See, e.g., Jim Arnold Corp. v, Hydrotech Sys., Inc., 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent right and on what terms typically is a question exclusively for state courts."); Roach v. Crouch, 524 N.W.2d 400, 403 (Iowa 1994) (question of patent ownership is properly triable in state court). There is no conflict between the creation of the patent as a creature of federal law, and ownership of patent property governed by state law. Federal preemption of state property law is not casually invoked. See, e.g., California v. ARC America, 490 U.S. 93, 100 (1989) (no preemption when compliance with both state and federal law is possible). Absent a specific act of Congress, there must be a conflict between federal and state law before the state is deprived of its authority. See Cipollone v. Liggett Group, 505 U.S. 504, 516 (1992)

2007-1211                                  4

("In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law."). No statutory preemption or federal/state conflict is here postulated. There is no authority for preempting state law, no authority for eliminating state law principles of property ownership, no authority for divesting state authority to determine rights and obligations set by employment contract, no authority for rejecting the extensive state precedent of law and procedure governing these issues.

State law governing employment contract interpretation is not excised when patents are involved. Employment contracts are generally governed by the law of the state of employment, in turn founded on the common law and state policy considerations embodied in statute. The complex balance between an employer's rights to control its proprietary information and safeguard its commercial interests, and an employee's rights to use his experience for purposes outside of the employer's interests, has traditionally been subject of state law, and when dispute arises, has been subject to trial to a jury. The experience, and precedent, of state courts is extensive on these questions. See, e.g., Anderson, Greenwood & Co. v. Martin, 44 S.W.3d 200, 220 (Tex. App. 2001) (jury trial of ownership of patent rights and contractual intent); Taborsky v. State, 659 So. 2d 1112, 1115 (Fla. App. 1995) (jury verdict on patent ownership and obligation to assign patent); Edwards v. Gramling Eng'g, 588 A.2d 793, 799 (Md. 1991) (jury trial of ownership of invention as between employer and employee); Mount Sinai Hosp. of Greater Miami, Inc. v. Cordis Corp., 329 So. 2d 380, 381 (Fla. App. 1976) (question of whether the hospital or the instrument manufacturer it hired was entitled to ownership of the patent was for the jury).

Ignoring precedent, in this case the factual issues of the employment contract and ownership of the Barstow inventions have been distorted into a question that the panel

majority calls "standing." and on this basis my colleagues affirm the district court's procedure of summary disposition--albeit without the constraints of the summary judgment rules. Neither state employment law, nor the jury role, can be eliminated by designating a disputed factual issue as related to "standing" and therefore "jurisdictional."

***Joinder of Necessary Parties***

As another flawed ruling, my colleagues state that if a necessary party refuses to join the case voluntarily, the plaintiff is out of court. That is inaccurate. A necessary party can be joined as a party plaintiff or a party defendant. See Fed. R. Civ. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff."). Rule 19 requires that a plaintiff have the opportunity to effect any necessary joinder when the issue is raised; my colleagues' prejudgment of this issue is unwarranted. The rule as applied to patent cases was early established, in a variety of factual situations. In Independent Wireless Telegraph Co. v. Radio Corporation of America, 269 U.S. 459, 468-469 (1926) the Court stated that "[i]f the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as coplaintiff, the licensee may make him a party defendant by process," citing Littlefield v. Perry, 21 Wall. 205, 223 (1874) and extensive additional precedent. See, also, e.g., Brammer v. Jones, 4 F.Cas. 11 (C.C. Ohio 1867); Gamewell Telegraph Co. v. Brooklyn, 14 F. 255 (C.C.N.Y. 1882); Waterman v. Shipman, 55 F. 982, 986 (2nd Cir. 1893); Libbey Glass Co. v. McKee Glass Co., 216 F. 172 (D.C. Pa. 1914), aff'd, 220 F. 672 (3rd Cir. 1915); Hurd v. Goold, 203 F. 998 (2nd Cir. 1913).

2007-1211                                          6

The Federal Circuit has followed precedent and the Federal Rules, although I have noted strained application to specific facts. However, the general rule dominates, as reflected in, e.g., IpVenture, Inc. v. Prostar Computer, Inc., 503 F.3d 1324, 1325 (Fed. Cir. 2007) ("Thus all entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement suit. When such an entity declines to join in the suit it may be joined involuntarily, either as a party plaintiff or party defendant; the purpose is to assure that all interested parties are before the court and that their interests are considered, as the Court explained in Shields v. Barrow, 58 U.S. (17 How.) 130, 141 (1854) . . ."); Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1347 (Fed. Cir. 2001) ("As a general rule, in accordance with *Independent Wireless*, this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights."); McNeilab, Inc. v. Scandipharm, Inc., 95 F.3d 1164, 1996 WL 431352, *2 (Fed. Cir. 1996) ("The Federal Rules of Civil Procedure authorize joinder of a necessary party, either voluntarily or involuntarily, as the circumstances may warrant."); Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128, 1133 (Fed. Cir. 1995) (patentee who does not voluntarily join can be joined as a defendant or involuntary plaintiff). In Israel Bio-Engineering Project v. Amgen, Inc., 475 F.3d 1256 (Fed. Cir. 2007), like Ethicon, Inc. v. United States Surgical Group, 135 F.3d 1456, 1468 n.9 (Fed. Cir. 1998), on which the panel majority relies, the court's rulings applied to the facts of the case, but did not hold that a necessary party can never be involuntarily joined or that a co-owner with adverse interests can always prevent the other owners from obtaining judicial relief.

2007-1211                                    7

The dicta of those cases cannot reverse the Federal Rules and binding precedent. As Independent Wireless concludes, permitting joinder of an unwilling but necessary party "would seem to be in accord with general equity practice." 269 U.S. at 469, citing Waldo v. Waldo, 17 N.W. 709 (Mich. 1883) and drawing analogy to the joinder of an unwilling trustee to protect the subject of the trust.

My colleagues summarily dispose of the case, ruling that neither Schlumberger, the self-appointed owner of the Barstow inventions, nor Schlumberger's customer who is the accused infringer MLBAM, can be reached by any process in any action. This ruling, along with the arbitrary inclusion of all four patents, whenever the inventions of those patents were made and all of which deal with baseball, not oil and gas drilling, cannot support this court's anticipatory rulings on the issues of waiver, estoppel, laches, standing, etc.

***Jurisdiction***

The panel majority calls its further discovery "jurisdictional discovery," in its relation to the ownership of the Barstow inventions and patents. It is hard to predict what may evolve from further discovery, which may adduce information about the conception and development of these inventions by Dr. Barstow and his brother, during and after Dr. Barstow's employment, as well as additional evidence concerning Schlumberger's contemporaneous negation of both interest and rights in these inventions. The circumstances surrounding the sale to MBLAM may also be informative. These are not matters of "jurisdiction," but of the merits of the ultimate questions.

The Court has commented on the trend to conflation of jurisdiction and merits. In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998) the Court explained: "It is firmly established in our cases that the absence of a valid (as opposed to arguable)

cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." (emphasis in original). The Court criticized what it called "drive-by jurisdictional rulings" where there is subject matter jurisdiction but an underlying fact is in dispute. Id. This criticism aptly fits the majority's designation of its remand as "jurisdictional discovery." As the Court explained in Arbaugh v. Y & H Corp., 546 U.S. 500 (2006): "A plaintiff properly invokes §1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." 546 U.S. at 513. In Arbaugh the Court referred to the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy" and observed that a dismissal for lack of jurisdiction "when some threshold fact has not been established" results in an "unrefined" disposition known as "drive-by jurisdiction." Id. at 511.

As in Arbaugh, the issues before us are not jurisdictional; they are of the merits. Indeed, the extensive authority throughout the regional circuits is footnoted in the majority opinion at n.3, but ignored, starting with the case of Autery v. United States, 424 F.3d 944, 956 (9th cir. 2005) (whether "jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits") (internal citation omitted).

### *Summary*

I concur in the remand for further discovery, with the understanding that the information adduced will be available for consideration with respect to any issue that may be relevant, including issues of waiver, estoppel, laches, and any others that may evolve. I respectfully dissent from the various erroneous pronouncements of law, fact, and procedure with which this opinion is encumbered.