# United States Court of Appeals for the Federal Circuit

---

**ABRAXIS BIOSCIENCE, INC.,**
*Plaintiff-Appellee,*

**v.**

**NAVINTA LLC,**
*Defendant-Appellant.*

---

2009-1539

---

Appeal from the United States District Court for the District of New Jersey in case no. 07-CV-1251, Judge Joel A. Pisano.

## ON PETITION FOR PANEL REHEARING AND REHEARING EN BANC

---

Before RADER, *Chief Judge*, NEWMAN, LOURIE, BRYSON, GAJARSA, LINN, DYK, PROST, MOORE, and O'MALLEY, *Circuit Judges*.

PER CURIAM.

GAJARSA, *Circuit Judge*, with whom LINN and DYK, *Circuit Judges*, join, concurs in the denial of the petition for rehearing en banc.

O'MALLEY, *Circuit Judge*, with whom NEWMAN, *Circuit Judge*, joins, dissents from the denial of the petition for rehearing en banc.

RICHARD DE BODO, DLA Piper LLP (US), of Los Angeles, California, filed a combined petition for panel rehearing and rehearing en banc for plaintiff-appellee. With him on the petition was SIEGMUND Y. GUTMAN.

MEREDITH MARTIN ADDY, Brinks Hofer Gilson & Lione, of Chicago, Illinois, filed a response to the petition for defendant-appellant. With her on the response were MARK H. REMUS, LAURA A. LYDIGSEN, and LUKE A. PARSONS.

## O R D E R

A combined petition for panel rehearing and rehearing en banc was filed by Plaintiff-Appellee, and a response thereto was invited by the court and filed by Defendant-Appellant.

The petition for panel rehearing was referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc and response were referred to the circuit judges who are authorized to request a poll whether to rehear the appeal en banc. A poll was requested, taken, and failed.

Upon consideration thereof,

IT IS ORDERED THAT:

(1) The Plaintiff-Appellee's petition for panel rehearing is denied.

(2) The Plaintiff-Appellee's petition for rehearing en banc is denied.

(3) The mandate of the court will issue on March 21, 2011.

FOR THE COURT

March 14, 2011          /s/ Jan Horbaly
Date                    Jan Horbaly
                        Clerk

# United States Court of Appeals for the Federal Circuit

---

**ABRAXIS BIOSCIENCE, INC.,**
*Plaintiff-Appellee,*

**v.**

**NAVINTA LLC,**
*Defendant-Appellant.*

---

2009-1539

---

Appeal from the United States District Court for the District of New Jersey in Case No. 07-CV-1251, Judge Joel A. Pisano.

GAJARSA, *Circuit Judge*, with whom LINN and DYK, *Circuit Judges*, join, concurring in the denial of the petition for rehearing en banc.

---

I concur in this court's decision not to rehear this case en banc because this is not an issue that rises to the level of importance of en banc hearing by this court. Contrary to the dissent, the majority opinion here does not create a federal common law that broadly displaces state law in the area of patent assignments.

On April 26, 2006, AstraZeneca ("AZ-UK") and Abraxis entered into an Asset Purchase Agreement. The agreement provided that AZ-UK "shall cause" the transfer of the three asserted patents to Abraxis. However, at that

time, those patents were owned by Astra Läkemedel Aktiebolag ("Astra L") and AstraZeneca AB ("AZ-AB"), not AZ-UK. On June 28, 2006, AZ-UK attempted to assign the patents to Abraxis, but failed because AZ-UK could not assign what it did not own. On March 15, 2007, Abraxis sued Navinta LLC for patent infringement. On the same day, AZ-AB and Astra L assigned the patents-at-issue to AZ-UK, but not to Abraxis. Subsequently, on November 12, 2007, AZ-UK finally assigned the three patents to Abraxis.

The analysis is simple. The panel, following Federal Circuit law, concluded that a party has no standing under Article III to bring an action if it does not own the patents when it files the action. 35 U.S.C. § 261 requires assignments to be in writing. In this case, Abraxis did not possess a written assignment of the patents-in-suit from the owner thereof at the time suit was filed.

The position advocated by the dissent would apply state law to effectively preempt federal law. When Congress has adopted a statutory scheme to apply in a particular field, federal law preempts state law. *See, e.g.*, *Campbell v. Hussey*, 368 U.S. 297 (1961); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The dissent suggests that New York state law pre-empts federal law. The position that AZ-UK's failed assignment to Abraxis on June 28, 2006 can be resurrected by a later transfer of the patents to AZ-UK on March 15, 2007 by ostensibly *nunc pro tunc* assignments is insufficient to avoid section 261 and the federal law of standing. Notwithstanding New York law, it is not possible to transfer an interest in a patent unless one owns the patents at the time of the transfer. Here, it is clear that AZ-UK did not own the patents and the intent of the parties cannot correct that fatal error. The district court, purportedly acting under New York state law, allowed the parties' intent to trump

the clear language of the agreements.  State law cannot retroactively override federal law to revive failed agreements, thereby conferring standing in federal court.

The panel majority correctly applied this court's precedent and federal law to find that Abraxis lacked standing and could not correct this deficiency after the inception of this suit.  This case does not conflict with our precedent or warrant en banc review.

# United States Court of Appeals for the Federal Circuit

---

**ABRAXIS BIOSCIENCE, INC.,**
*Plaintiffs-Appellee,*

**v.**

**NAVINTA LLC,**
*Defendants-Appellant.*

---

2009-1539

---

Appeal from the United States District Court for the District of New Jersey in Case No. 07-CV-1251, Judge Joel A. Pisano

O'MALLEY, *Circuit Judge*, with whom NEWMAN, *Circuit Judge*, joins, dissenting from the denial of the petition for rehearing en banc.

---

I respectfully dissent from the court's denial of Appellee's Petition for Rehearing En Banc. The panel majority's creation of federal common law to govern assignments of existing patents conflicts not only with our precedent, but with longstanding Supreme Court precedent restricting judicial preemption of state law. The Supreme Court has "uniformly" proscribed the judicial creation of "a special federal rule" absent a "significant conflict" between state law and "some federal policy or interest." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87

(1994) (citing *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). Though the panel majority did not identify such a conflict, by virtue of this decision, this court now requires the application of Federal Circuit contract law to transfers of existing patent rights, without regard for the state law jointly chosen by the contracting parties.

The consequences of this decision are not slight. This creation of a new body of law to govern transfers of patent rights – one applicable in this Circuit only – will disrupt substantial expectations with respect to the ownership of existing patents and impose unnecessary burdens on future transfers thereof. Parties may now be barred from pursuing claims for infringement of patents they indisputably own under state law, and choice of law provisions in large-scale asset purchase agreements such as that at issue here will become meaningless where patents are involved.

Because this decision conflicts with Supreme Court precedent and needlessly destabilizes parties' expectations, we should take the opportunity to correct this flawed precedent.

## I.

Though this case was nominally about Article III standing, that inquiry turned entirely on the question of who owned the asserted patents when suit was filed. The standing question, and Abraxis's right to pursue its claims, was dependent upon whether a series of contracts purporting to transfer the patents were effective to vest title to those patents in Abraxis before it filed suit. It is undisputed that the parties intended that the contracts be governed by New York law. Interpreting the contracts under New York law, the district court found that a subset of those agreements, all of which were executed before filing, did operate to vest title in Abraxis before it

brought suit. The majority did not dispute this finding. Rather, it ignored New York law when interpreting the contracts, and chose, instead, to create a new federal common law rule to assess the validity of patent transfers, relying on *dicta* in *DDB Technologies v. MLB Advanced Media*, 517 F.3d 1284 (Fed. Cir. 2008). Applying this new law, the majority concluded that Abraxis did not obtain title until several months after filing suit and, thus, lacked standing to pursue the three years of litigation on the merits that followed the District Court's standing ruling. As a judicially created federal rule tied to no conflict between state law and a federal policy, however, the majority's new rule is the type of rule rejected regularly by the Supreme Court.

The Supreme Court has held consistently that cases justifying the "judicial creation of a special federal rule" displacing state law are "few and restricted, limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers*, 512 U.S. at 87 (citing *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)) (internal quotations omitted). "[F]ederal courts, unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers." *Northwest Airlines v. Transp. Workers Union*, 451 U.S. 77, 95 (1981). Accordingly, whether "latent federal power should be exercised to displace state law is primarily a decision for Congress." *Wallis*, 384 U.S. at 68.[1] Even where, as here,

---

[1] The Supreme Court's decision in *Wallis*, 384 U.S. 63, is instructive. There, in the context of contracts transferring interests in federally granted land, rather than patent, rights, the Court held that state, rather than federal, law should apply. Reversing a Fifth Circuit decision applying federal common law to the transfer of leases obtained under the Mineral Leasing Act of 1920, the Supreme Court held: "However fitting this approach

"there is related federal legislation in an area," it "must be remembered that Congress acts against the background of the total *corpus juris* of the states." *Id.* (internal quotations omitted). Accordingly, matters left unaddressed by a comprehensive statutory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers*, 512 U.S. at 86.

This rule applies with no less force when the federal interest at issue is expressed in the Patent Act or relates to intellectual property rights granted thereunder. *See Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979); *Kewanee Oil v. Bicron*, 416 U.S. 470 (1974). In *Aronson*, the Supreme Court reversed the Eighth Circuit's determination that federal law should displace state contract law where patent rights are at issue. The Supreme Court explained that "[c]ommercial agreements traditionally are the domain of state law," and that state law "is not displaced merely because the contract relate[s] to intellectual property which may or may not be patentable . . . ." *Id.* at 262 (citations omitted). "In this as in other fields, the question of whether federal law pre-empts state law involves a consideration of whether that law stands as an obstacle to the accomplishment and execution of the full

---

may be where a State interposes unreasonable conditions on assignability [of the federally granted leases], it can have no force in this instance because Louisiana concededly provides a quite feasible route for transferring any mineral lease or contracting to do so, namely, by written instrument." *Wallis*, 384 U.S. at 69-70. The mineral lease rights at issue in *Wallis* were no less federal in origin than the patent rights at issue here and, as the Fifth Circuit noted, the right to assign those leases was itself a creature of federal statute. The Supreme Court was unconvinced, however, that the origin of the rights at issue was sufficient to displace state law governing their transfer.

purposes and objectives of Congress.  If it does not, state law governs."  *Id.* at 262 (citations and quotations omitted).  The Court then examined whether enforcement of the contract in that action was inconsistent with the purposes of the federal patent system, i.e., (1) "to foster and reward invention"; (2) "to promote[] disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires"; and (3) "to assure that ideas in the public domain remain there for the free use of the public."  *Id.* (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. at 480-81 (1974)).  Concluding that it was not, the Court reversed the Eighth Circuit's holding that "patent law principles governed [the parties'] contract," and endorsed the district court's application of state law.  *Id.* at 261, 266.

Thus, we must begin with the proposition that state law governs the relationship between contracting parties, even vis-à-vis their ownership of patent rights, where application of state law does not create a "significant conflict" with federal policies or interests articulated in a Congressional Act.[2]

---

[2] The  field preemption cases cited by the concurrence are inapposite.  Where Congress legislates in a field "which States have traditionally occupied," such as contract law, we must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (emphasis added).  Where, as here, Congress has not expressly stated such a purpose, it may be inferred under one of two theories.  *See California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987).  Under the theory of field preemption, a "scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it."  *Rice*, 331 U.S. at

## II.

Consistent with these principles, we have long held that "legal title to a patent is a question of state law." *See Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010); *see also Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009) (holding that "questions of patent ownership are determined by state law"); *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law.") (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008)); *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007) ("[T]he only question is one of ownership. State law, not federal law, addresses such property ownership disputes."); *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006) ("Assignment of ownership is governed by state law doctrines."); *Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) ("[P]roper construction of . . .

230. Nothing in 35 U.S.C. § 261, nor any other provision of the Patent Act, however, supports an inference that Congress had a "clear and manifest purpose" to "completely displace state regulation" of assignment agreements. *Guerra*, 479 U.S. at 281. Indeed, by providing that, subject to the provisions of Title 35, "patents shall have the attributes of personal property," § 261 confirms that Congress intended for state contract law to govern patent assignments, just as it had always governed transfers of other forms of personal property. 35 U.S.C. § 261. The only requirement imposed by § 261 is that such agreements be in writing. Because Congress expressed no clear intent to completely displace state contract law when patents are involved, *see Aronson*, 440 U.S. at 262, preemption is justified only to the extent that state law conflicts significantly with the writing requirement, or some other federal policy or interest. *See Guerra*, 479 U.S. at 281.

assignment agreements" is "a matter of state contract law."); *cf. Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989) ("A license agreement is a contract governed by ordinary principles of state contract law.").

Admittedly, our panel decision in *DDB Technologies* established a limited exception to this longstanding precedent for agreements assigning rights to future inventions where the question is "whether a patent assignment clause creates an automatic assignment or merely an obligation to assign." 517 F.3d at 1290. Reasoning that this question is "intimately bound up with the question of standing in patent cases," the majority in *DDB Technologies* held that federal law should displace state contract law when this question arises. *Id.* Until this case, however, our decisions following *DDB Technologies* have invoked this exception and applied federal law only to resolve the narrow issue of whether a new invention covered by an earlier assignment agreement is automatically assigned "by operation of law" "once the invention comes into being," *id.*, or whether a further act is required to effectuate the assignment. *See, e.g., Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 841 (Fed. Cir. 2009). This comes as no surprise, as a close inspection of the decision in *DDB Technologies* reveals it was never intended to create an exception so broad as to encompass agreements assigning <u>existing</u> patents, such as those at issue here.

At issue in *DDB Technologies* was whether one of the named inventors of the patents in suit had assigned his interest in those patents to his employer by virtue of a clause in his employment agreement granting the employer rights to any invention arising out of the employment relationship. If such an assignment had occurred, Plaintiff DDB Technologies LLC ("DDB") would have

lacked standing to maintain its suit without joining the employer as a co-owner of the asserted patents. In support of its claim that it was the sole owner of the patents, DDB argued that, "even if the patents in suit were within the scope of the [inventor's] employment agreement," the employer's claim of ownership was barred by a number of defenses. *DDB Techs.*, 517 F.3d at 1289. DDB did not dispute the district court's determination that applicable state law precluded an assignor from asserting those defenses to rescind a valid assignment. *Id.* Rather, DDB argued that, because assignment under the employment agreement was not "automatic," there was never a valid assignment and the defenses therefore remained available. *Id.* Consequently, the panel's initial inquiry was whether the relevant language in the employment agreement constituted a promise to assign in the future or an assignment that became automatic upon the issuance of the patent creating the property right.

In answering this question, the *DDB Technologies* panel first acknowledged that "state law governs the interpretation of contracts generally." *Id.* at 1290. Drawing on our analysis in *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1249 (Fed. Cir. 2000) and *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), however, the panel noted that, because "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases," we "have accordingly treated it as a matter of federal law." *Id.* Standing in isolation, this language may appear to encompass agreements beyond those assigning interests in future inventions. The remainder of the paragraph, however, clarifies that the exception applies only to agreements involving rights to <u>future</u> inventions:

> Applying federal law, we have held that whether an assignment of patent rights in <u>an agreement such as the one in this case</u> is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language. If the contract expressly grants rights <u>in future inventions</u>, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law." *FilmTec Corp.*, 939 F.2d 1568 at 1573 (contract provided that inventor "agrees to grant and does hereby grant" all rights in future inventions); *see also Speedplay*, 211 F.3d at 1253 (contract provided that employee's inventions within the scope of the agreement "shall belong exclusively to [employer] and [employee] hereby conveys, transfers, and assigns to [employer] . . . all right, title and interest in and to Inventions"). Contracts that merely obligate the inventor to grant rights in the future, by contrast, "may vest the promisee with equitable rights <u>in those inventions once made</u>," but do not by themselves "vest legal title to patents on the inventions in the promisee."

*DDB Techs.*, 517 F.3d at 1289 (emphasis added). Thus, *DDB Technologies* did no more than recognize an exception to our precedent for assignments of rights in future inventions – an exception it felt was compelled by earlier case law discussing future inventions. It did not broaden that exception to include assignments of existing patents, however. Nor could it have. Had the decision purported to extend the exception to assignments of existing patents, any attempted extension would have been <u>dicta</u> because that case did not involve an agreement assigning one or more existing patents.

Thus, no matter one's view of the propriety of the judicial preemption exercised in *DDB Technologies* as to assignments of rights in future inventions,[3] a separate preemption analysis was required to justify a new rule extending *DDB Technologies* to the much broader category of assignments of existing patents. *See O'Melveny & Myers*, 512 U.S. at 88 ("Not only the permissibility but also the scope of judicial displacement of state rules turns upon" the "significant conflict with some federal policy or interest."). Had the panel undertaken the necessary preemption analysis, it would have no doubt understood that its decision to displace New York law could not stand in the face of governing Supreme Court precedent.

As discussed above, the majority's creation of federal common law would have been proper only if the use of state law would have posed a "significant conflict" with an identifiable federal policy or interest. Despite precedent requiring that such a conflict be "specifically shown," the panel majority did not so much as mention a conflict. *See Wallis*, 384 U.S. at 68. Indeed, the closest it came to justifying its rule was when the majority quoted *DDB Technologies* for the proposition that, because "the ques-

---

[3] Many have questioned the wisdom of *DDB Technologies*, including whether the mere fact that a particular question of contract interpretation is "intimately bound up with the question of standing" is sufficient to justify judicial preemption of state law. *See, e.g.*, Ian N. Feinberg, et al., *Consequences of the Federal Circuit's New Reliance on Federal Common Law to Interpret Patent Assignment Agreements*, LANDSLIDE, Jan./Feb. 2011, at 45. Though it may be that *DDB Technologies* should be reconsidered because it too displaces state law without seeming to identify a sufficiently significant conflict with federal interests as a precondition to doing so, I do not now address the wisdom of *DDB Technologies*, only the unwarranted extension of its principles to existing patent rights.

tion of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases," we "have accordingly treated it as a matter of federal law." While there is surely a relationship between property rights – and their ownership – and standing, that does not give rise to a significant conflict with federal patent policy.

The fact that the result of both the ownership and standing inquiries may change based on which law is applied cannot possibly be enough to justify creation of a federal common law governing all patent assignments; if uniformity in the outcome of standing determinations were sufficient justification for preemption, "we would be awash in federal common-law rules." *See O'Melveny & Myers*, 512 U.S. at 88. Just as standing turns on "whether a patent assignment clause creates an automatic assignment or merely an obligation to assign," it also turns on the effect of a divorce decree on an ex-spouse's co-ownership interest in a patent,[4] whether a state court judgment transferring title in a patent may be nullified for fraud,[5] and the effect of foreign intestacy law on a plaintiff's ownership interest in a patent.[6] Like most legal inquiries bearing on patent ownership, these questions are "intimately bound up with the question of stand-

---

[4] *Enovsys*, 614 F.3d at 1336 (holding that, based on the effect of a divorce decree under California law, a company had standing to bring suit without joining the founder's ex-wife).

[5] *MyMail*, 476 F.3d at 1376 (holding that, as a matter of Texas law, the state court judgment could not be collaterally attacked).

[6] *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1358 (Fed. Cir. 2008) (remanding for a determination on the effect of Japanese intestacy law on the plaintiff's standing to sue).

ing in patent cases." Yet no one would seriously contend that this intimate bond justifies the creation of Federal Circuit common law pertaining to transfers of marital property, collateral challenges to state court judgments, or the impact of intestacy on patent ownership. The requirement that a significant conflict be specifically shown safeguards against this sort of proliferation of federal common law, and we should not have allowed the majority to skirt that restriction here to displace state contract law. *See Aronson*, 440 U.S. at 262.

## III.

The concurrence appears to argue that this case did not involve the application of federal contract law, but was, rather, a simple case of Abraxis lacking a written assignment of the asserted patents when it filed suit, and the district court allowing the operation of state law to retroactively cure defective standing.[7] Had the district court allowed that to occur, and the panel opinion was limited to that finding, I would not suggest that we revisit this case. But that is not what happened. To the contrary, before Abraxis filed suit, AZ-UK and its affiliates executed a series of agreements which, under the district court's interpretation of New York law, effectuated a written assignment sufficient to satisfy the writing requirement and, accordingly, Article III standing. Only by: (1) confusing the law relating to the retroactive transfer of title with principles prohibiting retroactive conferral of standing; and (2) interpreting the parties' agreements

---

[7] *See* Concurring Op. at 2-3. ("In this case, Abraxis did not possess a written assignment of the patents-in-suit from the owner thereof at the time suit was filed. . . . State law cannot retroactively override federal law to revive failed agreements, thereby conferring standing in federal court.")

under our doctrine pertaining to future inventions did the majority reach a different result.

To assess standing, we must apply constitutional concepts to underlying facts. In patent cases, standing turns on ownership of the patent rights at issue. *Speedplay*, 211 F.3d at 1249. Where the party filing suit purports to have obtained those property rights by assignment, we are to look to state law to assess the effect of that conveyance. *See Cook Biotech*, 460 F.3d at 1373. 35 U.S.C. § 261 requires the fact of a writing, state law defines the legal effect of any such writing, and standing principles require that a valid written transfer occur as of the filing of a complaint in federal court.

This case involved five separate writings, only one of which was executed after Abraxis filed suit. The first, executed in April of 2006, was a master Asset Purchase Agreement ("APA"), pursuant to which AZ-UK was to, "or was to cause one of its affiliates to," transfer to Abraxis "all of the right, title and interest" of AZ-UK and its Affiliates in certain patents, including those eventually asserted by Abraxis. *Abraxis Bioscience, Inc. v. Navinta LLC*, No. 07-1251, 2009 U.S. Dist. LEXIS 26959, *3 (D.N.J. Mar. 23, 2009). This transfer was to take place at, and as of, the "effective time," which, by operation of the definition in the APA, was June 28, 2006. *Id.* at *3-4. As contemplated by the APA, the parties executed an IP Assignment Agreement ("IPAA") on June 28, 2006, which provided that AZ-UK "hereby sells, assigns, conveys and transfers" to Abraxis all of AZ-UK's "right, title and interest in and to," the patents later asserted by Abraxis, among other IP rights. *Id.* at *4. Subsequently, in early 2007, AZ-UK learned that title to the asserted patents remained with two of its affiliates, and had not been formally assigned to Abraxis. Consequently, on March, 15, 2007, the affiliates executed additional documents

assigning these patents to AZ-UK. Then, in November of 2007, several months after Abraxis filed suit, AZ-UK executed an additional document "confirming" that Abraxis has owned all "right, title, and interest" to the asserted patents "since no later than June 28, 2006." *Id.*

Interpreting the agreements under New York law, the district court found that they conferred ownership of the asserted patents to Abraxis as of March 15, 2007, when it filed suit. Specifically, because the affiliates' March 15, 2007 assignment documents were "delivered in accordance with" the terms of the APA, they were to be effective as of June 28, 2006. Given this retroactive effect, the documents vested title to the asserted patents in AZ-UK as of June 28, 2006, and the IPAA therefore operated "to transfer title from AZ-UK to Abraxis as of that date as well." *Abraxis*, 2009 U.S. Dist. LEXIS 26959, at *13. Accordingly, all of the documents necessary to transfer title to Abraxis under New York law were actually – not retroactively – executed as of March 15, 2007, and Abraxis therefore had standing at the inception of its suit. The district court essentially found the November 2007 agreement to be a belt-and-suspenders confirmation of what had already been accomplished under New York law and, thus, not relevant to the standing analysis.

The panel majority, and now the concurrence, however, argued that AZ-UK's assignment to Abraxis on June 28, 2006 was insufficient to satisfy the writing requirement of 35 U.S.C. § 261 because "it is not possible to transfer an interest in a patent unless one owns the patents at the time of the transfer." Concurring Op. at 2; *Abraxis*, 625 F.3d at 1365 ("AZ-UK had no legal title to assign, and therefore, lacked standing to commence this litigation."). Accordingly, claimed the panel majority, "[e]ven if given retroactive effect, the March 15, 2007 assignments d[id] not automatically assign the patents to

Abraxis; a subsequent written agreement was necessary." *Abraxis*, 625 F.3d at 1365.

The first problem with this analysis is that it confuses ownership with standing. While it is true that the March 15, 2007 assignments could not have retroactively <u>conferred standing</u> on AZ-UK had it filed suit on June 28, 2006, that fact is irrelevant because AZ-UK did not attempt to sue on that date – it merely sought to transfer title to Abraxis by operation of the IPAA. The proper question was thus whether the March 15, 2007 documents could operate to retroactively <u>vest title</u> in AZ-UK as of June 28, 2006 such that the IPAA of the same date could operate to further transfer title, in writing, to Abraxis. As I noted earlier, both Supreme Court and our precedent require that we answer that question according to state law. *Enovsys LLC*, 614 F.3d at 1342 ("Who has legal title to a patent is a question of state law."); *see Aronson*, 440 U.S. at 262. Applying New York law, the district court answered that question affirmatively. Neither 35 U.S.C. § 261, nor Article III, imposes additional requirements prohibiting the type of transaction that occurred here.

The second – and more consequential – problem with the panel majority's analysis is that it answered whether the writings at issue in this case were sufficient to transfer title by reference to federal common law principles of contract interpretation recognized in *DDB Technologies* and other "promise to assign" cases.[8] As I explained

---

[8] The concurrence appears to disavow any reliance by the panel majority on our "promise to assign" cases, asserting that the panel majority's decision rested on 35 U.S.C § 261 and Article III standing principles. That the panel majority relied on those cases is evident from its response to the panel dissent's argument that the "promise to assign" line of cases was irrelevant: "The dissent's contention is erroneous. Because the APA is a promise by

earlier, however, those cases recognize a limited exception to the longstanding rule that state law governs the interpretation of assignment agreements only for assignments conferring interests in future inventions. Based on an extension of contract interpretation principles from those cases, the majority concluded that, even if the "March 15, 2007 agreements were considered to be retroactive, title to the asserted patents did not automatically vest in Abraxis upon the March 15, 2007 transfer to AZ-UK because the June 28, 2006 IP Assignment Agreement did not result in an immediate transfer of 'expectant interests' to Abraxis." *Abraxis*, 625 F.3d at 1359 (citing *Roche*, 583 F.3d at 841-842). According to this theory, "a subsequent written assignment was necessary," and that assignment did not occur until November 2007, almost eight months after Abraxis filed suit. *Id.* Nothing in New York law requires the type of "subsequent written assignment" the panel majority finds necessary.

Only by injecting a requirement from our "promise to assign" cases to a transfer of existing patents did the majority conclude that Abraxis lacked standing when it filed suit. There can be no doubt, accordingly, that the precedent created by *Abraxis* is one which directs the preemption of state law in connection with the assignment of existing patents, a precedent that simply cannot be reconciled with governing law.

---

AZ-UK to assign the relevant patents to Abraxis when AZ-UK obtains legal title, under our 'promise to assign' cases, a subsequent written agreement is necessary to consummate the assignment." *Abraxis*, 625 F.3d at 1365 (citing *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007)).

IV.

In addition to violating fundamental principles of pre-emption, the majority's rule unreasonably, and unnecessarily, imposes burdens on parties seeking to transfer patents rights.  Patent assignments, like the one in this case, occur in the context of large scale business transactions where the parties negotiate over, and depend upon, their choice of law provisions.  These provisions allow parties to anticipate how a court would interpret their agreement and to draft agreements so that a court's interpretation of it most likely will conform to the parties' intentions.  This is precisely what AZ-UK and Abraxis sought to do by including a New York choice of law provision in their agreements.  The parties' master agreement, moreover, contained an effective date provision, a tool widely used in IP transfer agreements, where the parties form an agreement in principle, subject to additional due diligence before finalizing the transfer of rights.  It is undisputed that, under New York law, parties to a written transaction may use such provisions to retroactively make a contract effective as of an earlier date.  Finding that the parties intended to give an earlier effective date to various agreements transferring the asserted patents, the district court found that the "relevant documents, taken as a whole, effectively transferred the rights in the patent to Abraxis" before it filed suit.[9]  *Abraxis*, 2009 U.S. Dist. LEXIS 26959, *13.  Without any superseding policy justification, the panel majority ignored the state law chosen by the parties and made no effort to scrutinize the

---

[9] Because  the majority applied only federal law to the question of ownership, and it is with that decision that I take issue, I express no opinion as to whether reasonable minds could differ with the district court's application of state law.

parties' intent or the effectiveness of the agreements under that law.

By disregarding the express intent of the parties that New York law apply, the panel's decision disrupts intellectual property transfers that rest on the expectation that the law jointly chosen by the parties will apply to both patent and non-patent assets.[10]  As a consequence, parties may lose standing to bring infringement actions with respect to patents that they indisputably own under state law.  And, as a corollary, because standing is an issue that may be challenged at any time during the proceedings, adjudged infringers may escape liability based on the fortuity that, under the majority's new rule, the relevant assignment agreements were insufficient to transfer title before suit, regardless of their sufficiency to do so under governing state law.

## V.

Had the majority followed our precedent and concluded that, under New York law, the agreements were insufficient to confer standing as of the filing date, I would not suggest en banc consideration of this case.  Indeed, had the majority applied the correct law but reached the wrong conclusion, I still would not suggest that we address the matter en banc.  While such a decision would effectively waste three years of litigation on the merits, I do not believe the important and difficult en banc process should be invoked based only on differences

---

[10] Absent   an express act by Congress, state law applies to the transfer of all other types of property, including copyrights.  *See* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.08[A] (2010); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 392 (6th Cir. 2007) (applying Tennessee law to interpret the parties' copyright contracts).

with a panel majority's application of governing law to the facts. Because the majority, instead, decided this case by expanding the coverage of *DDB Technologies*'s exception for agreements assigning rights to future inventions to the exponentially larger class of agreements assigning existing patents, however, I do not believe we can ignore the profound impact of this decision. For these reasons, I must dissent from the court's denial of Abraxis's Petition for Rehearing En Banc in this matter.